Argued and submitted November 14, 1997, accused suspended from office without salary for six months January 15, 1998

Inquiry Concerning a Judge re:

The HONORABLE STEPHEN L. GALLAGHER, JR.,
*Accused.*

(CJFD 95-96; SC S44156)

951 P2d 705

Robert A. Shlachter, of Stoll, Stoll, Berne, Lokting & Shlachter, P.C., Portland, argued the cause for the accused. With him on the briefs was Scott A. Shorr.

Susan D. Isaacs, Beaverton, argued the cause and filed the brief for the Commission on Judicial Fitness and Disability.

Katherine A. McDowell, Portland, filed a brief in behalf of *amicus curiae* ACLU Foundation of Oregon, Inc.

Before Gillette, Presiding Justice, and Van Hoomissen, Graber, Durham, and Kulongoski, Justices.*

PER CURIAM

---

* Carson, C. J., and Fadeley, J., did not participate in the consideration or decision of this case.

## PER CURIAM

This judicial discipline case comes before the court on direct review of a recommendation of the Commission on Judicial Fitness and Disability (Commission). Or Const, Art VII (Amended), § 8; ORS 1.430. The Commission concluded that Stephen L. Gallagher, Jr. (the accused), a judge of the Circuit Court for Multnomah County, had violated the Oregon Code of Judicial Conduct (Code) with respect to the first and second of the three charged causes of complaint, for which the Commission recommended that he be censured.

This court reviews the record *de novo*, ORS 1.430. We do so under a standard of clear and convincing evidence to establish a willful violation of a provision of the Code. *In re Schenck*, 318 Or 402, 405, 870 P2d 185 (1994). In this context, the court has defined a "willful" act to mean an act done with the conscious objective of causing the result or acting in the manner contrary to the applicable rule. *Schenck*, 318 Or at 405. On review pursuant to that standard, we conclude that the accused violated the Code with respect to the conduct charged in the second and third causes of complaint, and we suspend him for a period of six months during which he shall not receive the salary of his public office.

## I. THE CHARGES

In its second amended formal complaint, the Commission charged three forms of misconduct.

In the first cause of complaint, the Commission charged that the accused had personally solicited campaign contributions in willful violation of *former* Canon 7B(7) and *former* Canon 2A.[1] *Former* Canon 7B(7) provided:

"A judge may not:

"* * * * *

"(7) personally solicit campaign contributions; but a judge may establish committees to secure and manage financing and expenses to promote the judge's election and

---

[1] By order of the Oregon Supreme Court, the former canons of the Oregon Code of Judicial Conduct were superseded by the judicial rules in the new Code, effective January 1, 1996. Order No. 95-095 (Nov. 22, 1995).

to obtain public statements of support for the judge's candidacy."

*Former* Canon 2A provided:

"A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

The second cause of complaint charged that the accused had used official letterhead, his judicial assistant's work time, and other public resources for personal and campaign-related business. The Commission charged that the foregoing conduct willfully violated *former* Canon 2A and current JR 1-101(A) and (C) and JR 2-107. JR 1-101(A) provides:

"A judge shall observe high standards of conduct so that the integrity, impartiality and independence of the judiciary are preserved and shall act at all times in a manner that promotes public confidence in the judiciary and the judicial system."

JR 1-101(C) provides:

"A judge shall not engage in conduct that reflects adversely on the judge's character, competence, temperament or fitness to serve as a judge."

JR 2-107 provides, in part, that "[a] judge shall be faithful to the law."

The third cause of complaint charged that the accused had used his official position or office to influence or obtain an advantage in the manner in which he corresponded with the San Diego City Treasurer about a parking ticket that he had received, with golf course representatives, with airline representatives, with a magazine, and with various other persons and entities. The Commission charged that the foregoing conduct willfully violated *former* Canon 2A, JR 1-101(A), JR 1-101(C), JR 2-107, *former* Canon 2B and JR 1-101(F). *Former* Canon 2B provided, in part:

"A judge should not lend the prestige of the office to advance the private interests of others, nor should a judge convey or permit others to convey the impression that they are in a special position to influence the judge."

JR 1-101(F) provides, in part:

> "A judge shall not use the position to advance the private interests of the judge or any person, nor shall a judge convey or permit anyone to convey the impression that anyone has a special influence with the judge[.]"

The Commission also charged that all three forms of alleged misconduct violated ORS 244.040(1)(a), which provides:

> "No public official shall use or attempt to use official position or office to obtain financial gain or avoidance of financial detriment that would not otherwise be available but for the public official's holding of the official position or office, other than [listed exceptions that do not apply in this case]."

## II. FINDINGS OF FACT

The underlying facts that we find in this section of the opinion are not disputed.[2]

A. *General Background.*

The accused became a lawyer in 1968 and was in private practice until January 1981, when he was appointed as a judge of the District Court for Multnomah County. In May 1982, he ran unopposed to retain that position and was elected.

In the May 1984 primary, the accused ran against four other candidates for a vacant circuit court position. He won election to that seat in the November 1984 general election and, accordingly, began service as a judge of the circuit court in January 1985. The accused ran unopposed for re-election in 1990 and 1996.

B. *First Cause of Complaint.*

In the 1984 election, the accused's campaign incurred a substantial debt. In order to decrease that debt, the accused held his first golf tournament fundraiser in 1984.

---

[2] The reader may note, in our recitation of the facts, conduct that could be characterized as violating provisions of the Code other than those cited in the text above. For purposes of this case, however, we will confine our analysis to those violations charged by the Commission.

A golf tournament fundraiser, called "Hizzoner's Classic" or "Hizzoner's Annual Classic," was held annually from 1984 to 1995. The 1984 campaign debt was retired in 1989 or 1990.

The present charges concerning personal solicitation of campaign contributions stem from the 1995 golf tournament fundraiser. The accused sent a personal letter, dated August 18, 1995, to about 700 people who were on the mailing list for his golf tournament fundraiser.[3] That letter bore the accused's courthouse address. After describing the results of the 1994 golf tournament fundraiser, the accused's letter concluded:

> **"The 12th Annual is set for Friday, September 22, 1995, with tee times beginning at 12:15 at Eastmoreland. The Committee's letter is enclosed.**
>
> "Once again, thanks for your many years of friendship and support. Early next year, I will be running again for a new term. One major special-interest group has threatened to challenge my re-election, so your continued support is <u>especially</u> welcome and appreciated.
>
> "All the very best,
>
> "[signature]
>
> "HIZZONER"

(Boldface, underlining, and capitalization in original.)

At the bottom left of the signature page, the initials of the accused and of his judicial assistant appear, along with the notation "[e]nclosure."

The enclosure that accompanied the accused's letter in the same envelope, and that was included at his direction, was a one-page document dated August 18, 1995, from the Re-elect Judge Gallagher Committee. That document announced "Hizzoner's 12th Annual Classic" and stated, in part:

> "CONTRIBUTION: $100.00, which may be a dollar-for-dollar tax credit on your joint Oregon State tax return,[4] so it may actually cost you <u>nothing</u>! Such a deal!

---

[3] More than 30 recipients lived outside Oregon, including two in a foreign country, and many more recipients did not live in Multnomah County. Typically the tournament itself drew between 48 and 62 players.

[4] ORS 316.102 provides, in part:

"*** **Make your check payable to: Re-elect Judge Gallagher Committee.**" (Boldface, underlining, and capitalization in original.)

On a tear-off portion at the bottom there were spaces to respond with name, address, and handicap, followed by a space stating: "____ Sorry, I can't make it this year, but here's a donation for the campaign fund." Also enclosed was a return envelope addressed to "Hizzoner's Classic." That envelope bore the accused's home address.

## C. *Second Cause of Complaint.*

Judicial assistants are state employees who perform secretarial and other support services related to judges' official functions. The job description of a judicial assistant does not include the performance of personal or campaign services for judges. The accused knew that his judicial assistant was a state employee.

Linda Austin-Croft became the accused's judicial assistant in 1985. From 1988 through 1996, the accused had her type about 300 pages of personal documents on public equipment and during working hours. Austin-Croft generally typed those personal documents during the regular course of the work day, whenever they were presented to her. Although the official duties of Austin-Croft and the accused did not suffer as a result of this activity, Austin-Croft's typing of personal documents did not aid the accused in the efficient performance of his duties as a judge. Examples of the personal documents that Austin-Croft typed include the following:

---

"(1) A credit against taxes shall be allowed for voluntary contributions in money made in the taxable year:

"* * * * *

"(b) * * * [T]o or for the use of a person who must be a candidate for nomination or election to a federal, state or local elective office in any biennial primary election, presidential preference primary election, general election or special election in this state. * * *

"* * * * *

"(2) The credit allowed by subsection (1) of this section shall be the lesser of:

"(a) * * * [T]he total contribution, not to exceed $100 on a joint return; or

"(b) The tax liability of the taxpayer."

- A letter to the Consul General of France to secure a visa for the accused's daughter.

- A letter to the Commissary at McChord Air Force Base about cash register errors in relation to purchases made by the accused.

- Minutes of a neighborhood meeting.

- A letter to the president of Nordstrom about the price of a suit that the accused had bought.

- A letter to the president of Portland General Electric about service at the accused's residence.

- A letter to the president of United Airlines about securing bereavement rates for himself and his wife.

- A pleading in the accused's own divorce case.

- A letter about the Gallagher family coat of arms.

- A letter to the director of customer service at a computer publication, threatening to report practices to the Oregon Attorney General's office.

- A letter to *Golf World* magazine, threatening to report its business practices to the Oregon Attorney General's office.

- Letters to the San Diego City Treasurer about a parking ticket that the accused had received.

- Letters to his lawyer, his ex-wife, and others about issues in the accused's divorce case.

- Letters about his financial interests in Ireland.

- Letters to his lawyer and to a trustee in bankruptcy concerning the collection of a personal debt owed to the accused.

- Numerous letters to his siblings and others about his father's estate.

- Letters to acquaintances about his St. Patrick's Day party.

- Jokes and limericks.

- Letters to the Portland Golf Club disputing charges on his bill.

Most of the personal documents at issue were prepared and mailed on the accused's official stationery and were signed above the typewritten official title of Circuit Court Judge.

In addition to preparing personal documents for the accused, Austin-Croft occasionally assisted the accused during work time with other personal tasks. She obtained airline fares and schedules for him and booked a flight unrelated to his work. On occasion she picked up his dry cleaning and made haircut appointments for him.

Austin-Croft also performed campaign-related services for the accused, at his direction, during work time. With respect to the 1995 golf tournament fundraiser, Austin-Croft typed the accused's August 18, 1995, letter during working hours and on public equipment at the courthouse. She had typed similar letters in previous years.

Beginning in 1985, Austin-Croft helped with the annual golf tournament fundraisers in many other ways as well. While at work in the courthouse, she answered detailed telephone inquiries about the golf tournament fundraiser, both on the day of the tournament and on other days. The accused did not instruct her to refer such calls to the campaign committee.

On tournament days, which occurred during the regular work week, Austin-Croft prepared the lists of pairings and tee times. She took the prizes to the tournament site, where she performed administrative functions, such as collecting money. She also rode around the course in a golf cart with the video photographer who recorded the tournament. In a 1991 letter to participants in the fundraiser, the accused praised his judicial assistant for those tasks, thanking her by name as the person "who answers all your phone questions, oversees the distribution of towels, scorecards, etc., and gets us to the 1st tee on time." Austin-Croft performed those functions at the accused's request, and during what otherwise would have been her working time.

From 1985 to 1993, Austin-Croft designated golf tournament fundraiser days as regular work days on her

time sheets, even though she attended to court business for only a brief period on such days. In 1994 and 1995, on her own initiative, she changed the designation to either vacation or compensatory time. The accused approved and signed his judicial assistant's time records every month.

### D. *Third Cause of Complaint.*

Beginning in about 1986, the accused used official letterhead for many letters relating to the advancement of his personal interests. In most instances, the title "Circuit Court Judge" appeared immediately beneath his signature. The accused testified that "probably 95 percent" of his "non-official" personal business letters went out on his judge's stationery. Some examples follow.

In 1986, the accused wrote on official letterhead to a trustee in bankruptcy (who is a lawyer) concerning the collection of a personal debt owed to the accused. The accused previously had obtained a judgment against an individual who later filed for bankruptcy. The letter stated:

> "Further to our recent telephone conversation regarding [debtor's name], enclosed herewith is a copy of the transcript of [debtor's] judgment-debtor examination of September 9, 1986. It is at this proceeding where he admits for the first time that the amount of the commission he actually earned immediately before the date he filed bankruptcy was $60,000.00, rather than the $30,000.00 he was forced to acknowledge at the first meeting of creditors.

> "I respectfully request that, as trustee, you deny [creditor's] 'claim' in her son's bankruptcy estate. It is utterly spurious, as is just about everything these two phony baloneys do. If you have any doubt at all regarding these frauds, take a brief look at the transcript. If the activities described therein ain't fraud, what is?

> "Thanks for your consideration.

> "Very truly yours,

> "[signed] Steve

> "Stephen L. Gallagher, Jr.
> "Circuit Court Judge"

In 1988 and 1989, the accused wrote a series of three letters to the Portland Golf Club, all on court letterhead and using the title "Circuit Court Judge" immediately beneath the signature. The first letter stated that the accused intentionally had deferred payment of his bill. The letter then complained of various alleged errors of the bookkeeping office and the dining room. The accused enclosed partial payment and stated that no further payment would be made "[u]ntil a satisfactory explanation" of charges was received. A postscript said:

"Your form dunning letter, copy enclosed, was received by me on December 19, 1988, calling for a response one full day and part of another after receipt. By any measure, such inadequate notice is both unreasonable and insulting."

A second letter detailed the complaints of the accused and asserted that certain charges should be deducted from his bill. The accused submitted "the aforementioned balance as payment in full" of his outstanding bill as of the end of the previous month. The second letter concluded, in part:

"Kindly either reverse the amount or make a credit entry on my next statement. I do not expect to have any unpaid balance as of that date.

"I am sure you can tell that I am not particularly pleased with the way this matter was handled."

A third letter "insist[ed]" on a reply and reiterated that the accused "had been erroneously billed and should be credited with the sums" discussed earlier.

In 1989, the accused wrote to the supplier of a copy machine that he had bought at an auction, again on circuit court letterhead and again using the title "Circuit Court Judge" beneath the signature. The letter stated that the supplier had described the copier "as making copies in black or a selected second color." The accused stated that he had given the copier to his lawyer and that she had told him that her requests for an instruction manual, a warranty, and information about a service contract had gone unheeded.

"Further, the machine I requested that you deliver to her directly does not print in a selected second color, although

the representation that it would was significant in my decision to continue my bidding to the point of success.

"What am I to conclude from this treatment? Do you intend not to furnish the described machine? Do you intend to leave us without a manual describing the operation of the machine? Are you not interested in pursuing a service contract?

"Please respond to my questions, in order that I may advise her on how to proceed."

In 1989, the accused wrote to an insurance company regarding payment of household and automobile insurance. Among other things, the letter asked "that you waive any so-called late charges until we get this matter resolved." The one-page letter, prepared on circuit court letterhead, also used the title "Circuit Court Judge" beneath the accused's signature.

In 1991, the accused wrote to a computer publication, again on official letterhead and again using the designation "Circuit Court Judge" just beneath the signature line. The letter opened by stating that the accused was writing "to communicate my extreme displeasure with your company's tactics." After detailing what had occurred, the letter said, in part:

"Your promotion was grossly misleading and deceptive. What was advertised to be a one volume edition * * * in reality turned out to be, a series of volumes (how many, or what they cover I haven't a clue) which come periodically at your convenience.

"* * * * *

"You will receive the third of the three volumes upon delivery by the Postal Service. You will receive the other two only after I have received from you good funds to cover the postage required of $2.94. I will not accept any further of your publications.

"My intent is to report your shabby practices to the Oregon State Attorney General's Office. Perhaps criminal sanctions are in order. We don't like it much out here being duped by this kind of deception."

In 1992, the accused wrote to a physician who had examined his eyes and had recommended a change in the accused's prescription lenses. The letter said, in part:

"Upon receipt of your statement for the lenses, I submitted it to Blue Cross, which denied my claim because but 23 months (rather than 24 months) had elapsed since the last time my glasses were made. * * *

"I am enclosing my check in the sum of $214.00, representing the billing of $324.00 less the $110.00 Blue Cross coverage. Notwithstanding your assurance that I would be billed 'your price', I have determined that the charges incurred are 20 - 25% higher than comparable amounts charged elsewhere. Nevertheless, I will remit the balance of the full amount when you send me a corrected statement which can be processed through Blue Cross in order that I receive the coverage contemplated by the policy."

That letter, too, was on circuit court letterhead and bore the title "Circuit Court Judge" beneath the signature.

In 1993, the accused wrote on circuit court letterhead to a representative of *Golf World* magazine. That letter read, in part:

"The facts are these: in response to your offer during last Christmas season, I ordered a FREE subscription for my brother [name], and renewed my own: Total cost: $17.47. In other words, *two* subscriptions for the price of *one*. I paid $17.47, and the last correspondence from me to [another employee of the magazine] contained a copy of my check, front and back. For the first time, I receive a letter from you.

"Either you are going to honor your own promotional commitments or you are not. If you do not, I will cease to become a Golf World subscriber and report this entire matter to the Office of The Oregon Attorney General, Consumer Affairs Division.

"Very truly yours,

"Stephen L. Gallagher, Jr.
"Circuit Court Judge"

(Emphasis in original.)

The accused wrote a series of letters to the San Diego City Treasurer in 1995, protesting a notice of parking violation that the accused had received in December 1994. In this series of letters, the accused made clear that he was a judge.

The first such letter, which went out on circuit court letterhead, stated, in part, that the accused and his wife "were flabbergasted to have received a Parking Violation Notice." The accused's letter stated that they "had no prior notice whatsoever" of the parking restriction in question and that they had complied with a street sign. The letter ended with the sentence, "Thank you for your considerations." Immediately beneath that sentence, the accused's name and the title of "Circuit Court Judge" appeared.

The second such letter complained that the accused had received a "form response" to his first letter and that officials in San Diego had conducted "no investigation of the conditions at the location where I received the Parking Violation Notice." The letter then continued:

"Why is it that:

"(1)   You did not respond *to me*, when you had a letter containing my complete name and [courthouse] address and when you were informed in that letter that I was the driver of the alleged offending vehicle??? It was your own Notice that asked for this information, and it was supplied to you.

"(2)   No investigation of the scene of the alleged violation was made by anyone, although you represent by your computer-generated 'denial' of my 'dismissal request' that such an investigation has been conducted???

"I hereby insist that you honor my request for an administrative hearing on all aspects of your shabby treatment of citizens who visit San Diego. With reluctance, I enclose the exorbitant sum of $40.00. I further request that you set my hearing in late May 1995 on a Friday or a Monday, so that I can come back to San Diego over a long weekend. I also request that the photographs I included in my letter of January 23, 1995 be made available to me at the hearing." (Emphasis in original.)

The accused sent copies of that letter to, among others, the Mayor of San Diego and the Presiding Judge of the San Diego Superior Court.

A third letter[5] contained factual information respecting the validity of the parking violation, an affidavit from the accused's wife, and this text, in part:

> "I am unable to attend the referenced hearing in person, as I am presiding over a death penalty case [identified by name and court docket number], and several key witnesses are scheduled to testify on Monday, July 17, 1995."

On circuit court letterhead, also in 1995, the accused wrote to an Oregon travel agent to complain about a car rental agency that he had used during personal travel in San Diego. The accused noted that he had been pleased by his initial experience with that agency and had "authorized you to use my pleasant experience to support your recommendation [to use that agency]."

> "Three months later, I write to revoke my previous endorsement. What [the agency] charged me on October 31, 1994 has practically doubled in price. I paid $86.99 to rent a 1994 Nissan Sentra for one week. Today, I was quoted *$169.99* for the same car!! As it turns out, the only thing 'special' about [the agency] is the outrageous way they manipulate their pricing.
>
> "I will not use [the agency] again and direct you not to use my name as a reference." (Emphasis in original.)

The accused signed that letter above the title "Circuit Court Judge" and sent a copy to the car rental agency.

## III.  DISCUSSION OF CHARGED VIOLATIONS

In discussing the charged violations, we will limit our consideration to alleged violations of the canons and judicial rules. Whether any of the accused's conduct also violated ORS 244.040(1)(a) would have no bearing on the conclusions

---

[5] Between the dates of the accused's second and third letters regarding the San Diego parking ticket, Austin-Croft also wrote a letter requesting a postponement of a hearing in that matter. Her letter identified herself as a judicial assistant for the accused, a judge.

that we reach below or on the sanction that we deem appropriate. Therefore, we find it unnecessary to consider the possible application of that statute further.

## A. *Personal Solicitation of Campaign Contributions.*

With respect to his 1995 letter about the golf tournament fundraiser, the accused advances a series of arguments as to why he should not be found guilty of violating *former* Canon 7B(7) and *former* Canon 2A. Some of those arguments assert that the canons did not in fact prohibit his conduct. In the alternative, the accused argues that an application of the canons to his conduct would be unconstitutional.

We need not decide those questions. Whether the accused is guilty of the violations charged in the first cause of complaint would not alter the sanction that we deem appropriate. That being so, we need not decide whether the accused violated *former* Canon 7B(7) or *former* Canon 2A as charged in the first cause of complaint.

## B. *Personal and Campaign Use of State Resources.*

■ In the second cause of complaint, the Commission charged that the accused had violated (among other things) *former* Canon 2A, which required that a judge "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"; and JR 1-101(A), which currently contains substantially the same requirement. The accused acknowledges the underlying facts: that—at his direction—his judicial assistant performed purely personal and campaign tasks on work time, while being paid by the state, using state property (such as letterhead) and typing equipment (such as computers) in the process. Those facts constitute a violation of the charged rules. Court staff, court supplies, and court typing equipment are to be used for court business, not for personal and campaign purposes.

The accused argues for a "*de minimis*" or "incidental use" exception to the foregoing principle. An example given by the accused is having a judicial assistant make a personal telephone call to cancel a lunch appointment so that a judge may continue a trial into the lunch hour.

We assume that a *"de minimis"* or "incidental use" exception is proper. Normal human experience teaches that judges, like other workers, cannot separate personal life from work life completely. In this regard, the accused's example illustrates the point nicely.

But the accused's acts, as demonstrated in the record, can in no way be characterized as falling within such an exception. Over a period of years, it was the usual custom and practice of the accused to make personal use of a state employee and of state supplies and typing equipment for personal and campaign purposes. Those uses were substantial. Austin-Croft spent almost full working days, for instance, administering the annual golf tournament fundraiser, and for many years designated even the golfing days as regular work time on her time sheets, which the accused approved and signed as her supervisor. Additionally, the quantity of the accused's personal documents, prepared by a state employee on work time and using official stationery, was voluminous.

We conclude that the accused's extensive use of his judicial assistant's time, and of state property and equipment, for personal and campaign purposes violated *former* Canon 2A. Taxpayers have a right to expect that the employees and the materials for which they pay will be used for public purposes. Obtaining substantial personal and political benefits directly from the use of those public employees and materials runs afoul of the requirement to "act * * * in a manner that promotes public confidence in the integrity * * * of the judiciary." For the same reason, the accused's conduct violated JR 1-101(A), which contains substantially the same requirement.

## C. *Use of Office to Advance Private Interests.*

The third cause of complaint alleged that the accused had violated, among other things, *former* Canon 2A, which provided that a judge "should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"; JR 1-101(A), which currently contains substantially the same provision; JR 1-101(C), which provides that "[a] judge shall not engage in conduct that reflects adversely on the judge's character, competence,

temperament or fitness to serve as a judge"; *former* Canon 2B, which prohibited a judge from lending the prestige of the office to advance the private interests of others and from conveying the impression that others are in a special position to influence the judge; and JR 1-101(F), which prohibits a judge from lending the prestige of the office to advance the private interests of the judge or of another and from conveying the impression that anyone has a special influence with the judge. The Commission concluded that the accused was not guilty of the matters charged in the third cause of complaint. Neither party asked this court to come to a different conclusion, and neither party briefed the issue substantively.

Nonetheless, it is this court's task to consider the whole case *de novo*. Pursuant to ORS 1.430(1), this court "*shall* review the record of the proceedings under ORS 1.420 [relating to the Commission's procedures respecting charges of misconduct] on the law and facts." (Emphasis added.) We are mindful that in some past cases this court—although recognizing its authority to consider all matters charged—has chosen to limit review to only those causes of complaint against a judge that resulted in a conclusion by the Commission that the judge had violated a provision of the Code. *See, e.g., Schenck,* 318 Or at 404 n 3 (reviewing only those causes of complaint for which the Commission had found a willful violation of a canon). On the other hand, in lawyer discipline cases, the court has exercised its authority to consider all charged conduct. *See, e.g., In re Biggs,* 318 Or 281, 864 P2d 1310 (1994) (finding additional violations of the charged disciplinary rules and increasing the accused's discipline from a two-year suspension to disbarment).

In this case, we exercise our authority to consider all charged conduct, for three reasons. First, the conduct charged in the third cause of complaint is repeated and serious, and the nature of the charge does not duplicate the kind of misconduct complained of in the other causes of complaint. Second, we note (as discussed more fully below) that the Commission found that the accused had committed some of the charged acts; it went on to conclude only that the conduct was not willful. Third, the Commission's conclusion concerning willfulness is facially dubious. We turn to a consideration of the merits of the third cause of complaint.

■ The Commission found that the accused's use of official letterhead and the title "Circuit Court Judge" in connection with correspondence relating to his parking ticket in San Diego "would cause an objective observer to conclude he was attempting to receive better treatment than the average citizen protesting a parking ticket would receive." We agree with and adopt those findings.

In addition, we find that the use of official letterhead—and in most instances further references to the accused's office (such as the typing of his title beneath his signature)—in the examples quoted in the Findings of Fact above would cause an objective observer reasonably to conclude that the accused was lending the prestige of the office to advance his own private interests. In some cases advancement of the private interests of others was involved, at least in part: his lawyer (with regard to the matter of the copier); his brother (with regard to the magazine subscription); and his wife (with regard to the matters involving the accused's own financial interests).

In this connection, we note that the official commentary to Canon 2B of the American Bar Association's *Model Code of Judicial Conduct* (1998) (ABA Code) states, in part:

> "Judges should distinguish between proper and improper use of the prestige of office in all of their activities. For example, it would be improper for a judge to allude to his or her judgeship to gain a personal advantage such as deferential treatment when stopped by a police officer for a traffic offense. Similarly, *judicial letterhead must not be used for conducting a judge's personal business*." Commentary to Canon 2B of the ABA Code (emphasis added).

The relevant portion of Canon 2B of the ABA Code is almost identical to *former* Canon 2B of the Oregon Code of Judicial Conduct and is similar to the pertinent provision of JR 1-101(F). Although this court is not bound by the ABA's commentary, we approve of the quoted interpretation.

Notwithstanding its factual findings, the Commission concluded that the accused did not act willfully,[6] but only

---

[6] As noted above, in this context a "willful" act is an act done with the conscious objective of causing the result or acting in the manner contrary to the applicable

negligently. We disagree with that conclusion on "willful-
ness" for several reasons.

First, the accused's testimony demonstrated that he
knew what the ABA's commentary has made clear: that court
stationery is for court-related business. Indeed, he had pur-
chased and used separate personal stationery for noncourt
purposes, but his supply "ran out."

Second, the accused *repeatedly* used the letterhead
and title of his office in correspondence designed to obtain
personal advantages, including financial advantages, for
himself and those close to him. That frequency suggests that
the practice was far from inadvertent.

Third, the official letterhead of the circuit court is
colorful and conspicuous, and in most instances the accused
placed his title just beneath his signature. Those elements
suggest that the accused knew both that he was using sta-
tionery that featured his judicial identity and that the fact of
his position was likely to play a prominent role in the reci-
pient's response to each such letter.

Fourth, many of the letters were demanding, and
many of them asserted legal propositions in close proximity
to reminders of the accused's status as a judge. Examples
include his letters to the bankruptcy trustee, the Portland
Golf Club, the computer publication, and *Golf World* maga-
zine. 326 Or at 276-79. Those factors suggest that the accused
intended his position to lend weight or credibility to his
assertions.

Accordingly, we conclude that the foregoing conduct
was willful and that it violated *former* Canon 2B and JR
1-101(F).

We also conclude that this conduct violated *former*
Canon 2A and JR 1-101(A). The use of one's judicial office as
a pressure tactic to gain personal advantages for oneself and
one's relatives and friends undermines public confidence in
the judiciary and in its integrity and impartiality.

---

rule. *Schenck*, 318 Or at 405. It is not necessary that the judge know that the con-
duct in question violates an ethical rule, so long as the judge is aware of circum-
stances that make the rule applicable. *Ibid.*

Finally, we conclude that this conduct violated JR 1-101(C). An inappropriate attempt to gain such personal advantages "reflects adversely on the judge's character, competence, temperament or fitness to serve as a judge."

## IV.   PROCEDURALCHALLENGES AND AFFIRMATIVE DEFENSES

The accused raises several challenges to the Commission's procedures. Additionally, he presented several affirmative defenses. We have considered each issue and all arguments made in support thereof. We are not persuaded by any of those arguments, but an extended discussion of our reasons would not benefit bench or bar.[7]

## V.   SANCTION

We begin our consideration of an appropriate sanction by reiterating the aims of judicial discipline:

> "Judges are disciplined primarily to preserve public confidence in the integrity and impartiality of the judiciary. Thus, disciplining judges serves to educate and inform the judiciary and the public that certain types of conduct are improper and will not be tolerated. Discipline of a judge also serves to deter the disciplined judge as well as other judges from repeating the type of conduct sanctioned." *Schenck,* 318 Or at 438.

The accused portrays this proceeding as being primarily an overreaction to his asking a judicial assistant to perform a handful of trivial, sporadic, and incidental personal tasks. That perspective misses the main point. Most seriously, the accused systematically used state-paid services, property, and equipment to further his campaign fundraising and his private interests, and he systematically used his position as a judge to try to obtain financial advantages for himself and those close to him.

In setting the sanction in this case, we consider several factors to be significant. Many of those factors point to the need for a substantial sanction: The misconduct covered

---

[7] Because of the result that we reach in this case, we need not and do not discuss the accused's counterclaim for attorney fees in the event that he were to prevail.

in the second and third causes of complaint was frequent and formed a persistent and pervasive pattern of behavior. The misconduct covered in the third cause of complaint illustrated that the accused exploited his position to satisfy personal desires. The effect of the misconduct covered in the second cause of complaint was to the indirect economic detriment of the public. The accused was an experienced judge at the time of the charged conduct and therefore was well familiar with the high standards of behavior that the privilege of judicial service demands. The accused's conduct adversely affects the public's perception of the integrity and dignity of the judiciary.

Another factor, however, weighs against a more severe sanction. There have been no prior complaints about the accused.

The Commission asks that we consider as an aggravating factor the accused's "tactics designed to obstruct and delay" the Commission's processes. We need not decide whether such tactics could be an aggravating factor, because we do not agree with the Commission's characterization of the accused's actions. Although his defense was vigorous, it was not improper.

Taking into account the reasons for imposing judicial discipline, the nature of the accused's misconduct, and all the other factors described above, we conclude that the appropriate sanction in this case is a six-month suspension during which the accused shall not receive the salary of his public office.[8]

The accused is suspended from office without salary for a period of six months, commencing on the effective date of this decision.

---

[8] Cases that we have found from other jurisdictions are not sufficiently analogous to provide guidance as to the appropriate sanction in this case.