Original
No. JD-2007-003

COFFEY'S CASE

Argued: February 6, 2008
Opinion Issued: April 18, 2008

*Wiggin & Nourie, P.A.*, of Manchester (*Richard B. McNamara* on the brief and orally), for the Judicial Conduct Committee.

*Upton & Hatfield, LLP*, of Portsmouth (*Russell F. Hilliard* on the brief and orally), for the respondent.

DUGGAN, J. The New Hampshire Supreme Court Committee on Judicial Conduct (JCC) determined that the respondent, Superior Court Judge Patricia C. Coffey, engaged in serious misconduct in violation of Canons 1 and 2 of the Code of Judicial Conduct (the Code). *See* SUP. CT. R. 38. This conclusion was based, in part, upon Judge Coffey's admission that she aided her husband in protecting his assets from the reach of creditors and, consequently, impeded the Professional Conduct Committee (PCC) in its efforts to collect on a valid, court-ordered debt. In light of its findings, the JCC recommended that Judge Coffey be: (1) publicly censured; (2) suspended without pay from all judicial duties and responsibilities for three months; and (3) ordered to reimburse the JCC for the expenses incurred in prosecuting her case. On appeal, Judge Coffey urges us to adopt the JCC's recommended sanctions or, in the alternative, to reduce the sanction to public censure only. We adopt the JCC's recommendation for public censure and grant its request for reimbursement, but we conclude, based upon the analysis that follows, that the three-month suspension must be increased to three years.

I

The record supports the following facts. Judge Coffey has been a New Hampshire Superior Court justice for approximately fifteen and a half years. Prior to serving on the superior court, she was a district court judge for two years and a special justice on the municipal court for approximately two years. In addition, she was a member of the JCC for several years.

This disciplinary matter was commenced in response to Judge Coffey's conduct during, and subsequent to, the PCC proceeding brought against her husband, John J. Coffey. *See Coffey's Case*, 152 N.H. 503 (2005). By way of background, Mr. Coffey had charged an elderly, mentally ill client an

excessive fee in connection with an appeal regarding residential property on Ocean Boulevard in Rye. *Id.* at 504-05. When his elderly client expressed concern about paying his fee in cash, Mr. Coffey convinced her to sell him the property that was the subject of the dispute, "largely [as] a gift, and partly for fees," for $150,000 less than its assessed value. *Id.* A referee determined that this fee was "clearly excessive" and that the elderly client "lacked the mental capacity to make an informed decision about conveying the [subject] property." *Id.* at 508, 510. We held that Mr. Coffey had violated New Hampshire Rules of Professional Conduct 1.4(b), 1.5(a), 1.7(b), 1.8(a)(1), 1.8(b), 1.8(j), 2.1 and 8.4(a) and ordered that he be disbarred. *Id.* at 504. It has not been alleged that Judge Coffey participated in any way in the conduct giving rise to Mr. Coffey's disbarment.

The disciplinary hearings against Mr. Coffey were commenced in June 2003. Judge Coffey later testified in this case that when she looked at the PCC's charges, she thought that Mr. Coffey had "probably violated . . . the canon[ ] on . . . taking an interest in property that was the subject of litigation," but felt that all of the rest of the charges, including the ones regarding "his lack of honesty or integrity," were not valid. Judge Coffey also testified that she "knew or should have known that . . . there could well be legal fees owed by [Mr. Coffey] to the PCC" arising from his disciplinary proceedings, but added that such debts "w[ere]n't anything [she] thought of" at the time. "Indeed, while she conceded that she" should have thought of the possibility of such debts, she insisted that she "didn't."

The PCC conducted its final hearing in Mr. Coffey's case on October 31, 2003. Four days later, Judge Coffey and Mr. Coffey executed legal documents establishing the "Coffey Family Revocable Trust" (the Trust), of which Judge Coffey was the sole trustee and beneficiary. As the sole trustee, Judge Coffey was permitted to pay "income . . . and such parts of the principal of th[e] [T]rust to, or for the benefit of" herself. Moreover, she was the only person who had the express authority to revoke the Trust. Mr. Coffey, in contrast, had no legal rights or equitable interest in the Trust assets and would only obtain such rights if Judge Coffey died or became incapacitated. The Trust further provided, as part of a spendthrift provision, that "the interest of any beneficiary . . . shall not be reached by . . . or be subject to the interference or control of creditors . . . and all payments to, or the interest of, any beneficiary shall be free from the control or claim of any spouse." Judge Coffey asserts that Mr. Coffey drafted the Trust and, to the best of her recollection, obtained the Trust documents from a standard legal-forms text.

As indicated in a "Schedule A," the Coffeys funded the Trust with the following assets: First, Mr. Coffey transferred to the Trust his individual 100% interest in the condominium that had served as office space for his law

practice, together with all furniture, furnishings and residual personal property located therein. Second, Judge Coffey and Mr. Coffey transferred to the Trust two pieces of real property that they jointly owned as husband and wife. The first, a parcel of property located on Washington Road in Rye (Washington Road Property), had been recently acquired by the Coffeys from Judge Coffey's parents and currently serves as their permanent residence. The second, a parcel of property located on Pioneer Road in Rye (Pioneer Road Property), had been the Coffeys' permanent residence until they purchased the Washington Road Property. Finally, the Coffeys transferred to the Trust "[a]ll household contents, furniture, furnishings, items of personal ornament and residual personal property and effects" located at the Pioneer Road Property and the Washington Road Property, as well as $500 in cash.

On December 1, 2003, while the PCC case against Mr. Coffey was still pending, the Coffeys executed three deeds transferring the real estate to the Trust. As later acknowledged by Judge Coffey, the tax stamps affixed to the deeds indicate that at least two of these properties were transferred without consideration.

On December 5, 2003, a few days after the Coffeys conveyed all of their real property into the Trust, the PCC notified Mr. Coffey of its decision that he had committed professional misconduct and that it would be filing a petition with this court recommending a two-year suspension. On December 29, 2003, after denying Mr. Coffey's motion for reconsideration, the PCC filed its petition with this court, recommending suspension and seeking an order requiring Mr. Coffey to reimburse it for all expenses incurred investigating and prosecuting the case. *See* SUP. CT. R. 37(16) (amended 2003) ("all expenses incurred by the committee and by bar counsel in the investigation and enforcement of discipline shall be paid by the New Hampshire Bar Association in the first instance but *may*, in whole or in part, be assessed to a disciplined attorney to the extent appropriate" (emphasis added)). Judge Coffey was aware of this petition and later acknowledged that she is aware of the rules granting the PCC authority to petition this court for recovery of its costs. On December 31, 2003, only two days after the PCC filed its petition requesting recovery of its costs, the Coffeys recorded the three deeds conveying all of their real estate into the Trust in the Rockingham County Registry of Deeds.

On May 24, 2004, approximately five months after the PCC ruled against Mr. Coffey and indicated that it would seek reimbursement for costs, Judge Coffey, as trustee, sold the Pioneer Road property for over $400,000. Although the record fails to indicate how much of that amount was profit, Judge Coffey stated that a portion of the proceeds went towards satisfaction of a mortgage on the property, repayment of an equity loan, and

satisfaction of some credit card debt. Moreover, she stated that $100,000 was transferred to her parents as consideration—in conjunction with a $300,000 mortgage—for their earlier acquisition of the Washington Road property. More specifically, Judge Coffey testified that she and Mr. Coffey had "had [the Pioneer Road property] on and off the market for a little while," and that her "father didn't want to continue carrying the cost of the [Washington Road property] while [the Coffeys] waited for [the Pioneer Road property] to sell." She explained that they, therefore, agreed at some point prior to the creation of the Trust, that she and Mr. Coffey would take "the [Washington Road property] from [her parents] first," execute a $300,000 mortgage in her parents' favor, and pay them $100,000 when the property sold.

As to the remainder of the proceeds from the sale of the Pioneer Road property, Judge Coffey stated that they "put it all into [the] Washington Road" property. In particular, she stated that they "had obligations coming up for contractors for new systems." According to Judge Coffey, all of the money expended on the Washington Road property was required for necessary repairs, including "a new roof, new siding, new plumbing, [and a] new heating system." Furthermore, she asserted that they "didn't put the [repairs] in frivolously" and that they "put them in because [they] needed them." The record demonstrates that at least a portion of the expenses for these "needed repairs" arose from construction of a two-car garage and additional office space that the Coffeys had contracted to put on the house. As discussed more fully below, the record lacks further evidence, such as receipts or contracts, regarding the necessity of these repairs. There is also nothing in the record to indicate that the Coffeys notified the PCC of the sale of the Pioneer Road property at this time.

On August 12, 2005, we issued our opinion disbarring Mr. Coffey. *Coffey's Case*, 152 N.H. at 515. In it, we ordered that, pursuant to former Supreme Court Rule 37(16) (amended 2003), Mr. Coffey was "to reimburse the committee for all of its expenses, including legal fees, incurred in investigating and prosecuting this matter." *Id.* On September 7, 2005, the PCC sent Mr. Coffey an invoice for expenses of approximately $75,000, along with a financial affidavit form and a letter requesting that Mr. Coffey "propose a payment plan." Mr. Coffey completed the affidavit and responded to the PCC, claiming "that he was unemployed, owned no property," and thus lacked "a present ability to pay." Judge Coffey alleges that she did not see the request for a proposed payment plan, but acknowledges that she was aware of the demand, and that she and Mr. Coffey "didn't make any effort to pay, expecting [that they would] hear something from the [PCC]," such as another bill. Moreover, she concurred with her husband that, even if they had received additional correspondence,

the couple had "no money to pay." The record indicates that the Coffeys did not inform the PCC of the Trust at this time and that, at some point in this timeframe, the Coffeys received $10,000 from the sale of stock.

On October 31, 2005, approximately seven weeks after Mr. Coffey had received the PCC's formal demand for payment and claimed an inability to pay, Judge Coffey sold the office condominium that Mr. Coffey had transferred to the Trust for $240,000. After paying off the mortgage on the condominium in the amount of $35,639.12, condominium association arrearages in the amount of $11,299.81, and realtor commissions, attorneys' fees, taxes, and other costs totaling $16,371.11, Judge Coffey netted $176,689.96 from this sale. According to Judge Coffey, as with the sale of the Pioneer Road property, the proceeds from this sale were spent on living expenses and making improvements to the Washington Road property. Again, the record does not indicate that either Judge Coffey or Mr. Coffey informed the PCC of this sale at this time.

By December 21, 2005, the PCC still had not received any payments or contact from the Coffeys. In an effort to spur recovery, the PCC obtained assistance from outside counsel, Jay Niederman. During his subsequent investigation, Niederman uncovered, for the first time, the three deeds transferring all of the Coffeys' real property to the Trust. Accordingly, on April 3, 2006, Niederman contacted the Coffeys and "advis[ed them] of the possibility of proceedings under the Uniform Fraudulent Transfers Act." *See* RSA ch. 545-A (2007). In addition, Niederman requested that the Coffeys provide "nine items to further understand the motivation for the transfers" and "an accounting of the cash proceeds the[ ] transfers had generated."

Judge Coffey met with Niederman to discuss the matter on May 1, 2006. According to Judge Coffey, at that meeting she offered a "preliminary concept to resolve the claim," but was informed by Niederman that he anticipated the PCC would require additional documentation before considering settlement. Niederman did indeed request such documentation from Judge Coffey by letter dated June 13, 2006. Judge Coffey complied by providing "verification of payments to [her] son's college, copies of checks and check registers, closing documents, IRS documents, monthly bank statements, and copies of contracts with workmen for the necessary repairs to the physical plant of " the Washington Road property. But, according to Niederman, it was not until a subsequent meeting in early September 2006—approximately one year after Mr. Coffey first received the PCC's demand—that Judge Coffey first engaged in "some general discussion of a possible settlement." In either event, it is clear that at some point Judge Coffey suggested that Mr. Coffey would liquidate his IRA in partial satisfaction of the debt.

On June 10, 2006, Judge Coffey, as trustee of the Trust, obtained a refinance mortgage on the Washington Road property in the amount of $280,000. After paying off an old variable-rate mortgage on the property, as well as $20,502 in credit card debt that Judge Coffey testified the mortgagee required them to pay off prior to approving the loan, the Coffeys netted $57,134 from this refinancing. With that money, the Coffeys paid $3,155 to settle a debt owed exclusively by Mr. Coffey for Yellow Pages advertisements, provided their adult son with $3,300 for "housing, auto and student loan expenses," paid $2,938 in property taxes, and made four mortgage payments in the amount of $9,752. The remaining proceeds, totaling $38,546, were used to pay contractors for work on the Washington Road property. None of the money went towards satisfaction of the PCC's claim. Moreover, the record does not indicate that the Coffeys informed the PCC of the refinancing at this time.

In his letter to the JCC, Niederman noted that, after reviewing the documentation Judge Coffey provided regarding the various real estate transactions, both he and the PCC's staff auditor, Craig Calaman, became "satisfied that the Coffeys had adequately explained the disposition of proceeds." It is difficult to determine from this statement whether Niederman and Calaman actually concluded that the money invested in the Washington Road property was for necessary repairs, or whether they were merely stating that the Coffeys had indeed spent the money as they had claimed. This uncertainty is further exacerbated by the fact that, according to the handwritten notes Judge Coffey provided to the JCC, from 2004 until the end of 2006, the Coffeys spent approximately $263,000 on improvements to the Washington Road property. *At least* $110,000 of that amount was spent after our August 12, 2005 order, and included such expenditures as $2,440 for a replacement faucet, vanity and sink from Ethan Allen, and $5,775 in pressure treated lumber for a deck. The remaining amount was spent prior to our order, but included such expenditures as: (1) replacement "kitchen cabinetry"; (2) replacement "kitchen countertops"; (3) "replacement appliances"; (4) replacement "kitchen sink and faucet"; and (5) plumbing work to existing master and hall bathroom.

Despite Judge Coffey's assertions that all of these expenditures were either necessary or contracted for prior to our order mandating repayment, the JCC failed to incorporate, as part of the record, all of the contracts and documentation that Niederman considered. Nor did the JCC make any specific finding concerning the necessity of these repairs, instead only expressing "concern" that "some considerable funds were available after [our] order" and "no attempt at repayment was made or compromise offered until" Niederman contacted the Coffeys. As a result, because the

JCC does not appear to have questioned Niederman's findings and the contracts and documentation are not part of the record, our review of these expenditures is, necessarily, limited.

On November 21, 2006, the PCC reviewed the status of the case, voted to bring the matter to the attention of the JCC, and told Niederman to file a civil action regarding the conveyances. Niederman, however, suggested the PCC reconsider filing suit given "the merits and risks attendant to such litigation." The PCC ultimately agreed and authorized Niederman to make one last attempt to resolve the matter. Accordingly, on December 6, 2006, Niederman contacted Judge Coffey and, although she "was distraught when she first learned of the" PCC's intention to contact the JCC, she agreed to a settlement. Under the settlement, the Coffeys agreed to liquidate Mr. Coffey's IRA, thus providing the PCC with approximately $25,000, and execute a mortgage on the Washington Road property for the remaining balance of the PCC's claim. The record indicates that this was the third mortgage on the property, but it does not disclose its precise terms.

The PCC accepted the settlement and referred Judge Coffey's case to the JCC, thus initiating the present action. *See* SUP. CT. R. 40(4). In its referral letter, the PCC described its lengthy efforts to obtain payment and expressed "concern that property may have been conveyed improperly in violation of the Uniform Fraudulent Transfer Act." Judge Coffey responded on January 2, 2007, asserting that she "never had ANY intention of avoiding ANY debt, current or prospective, when the trust was signed and later recorded, and most especially, not a court order for repayment of legal fees." She argued that, if she and her husband had intended to shield their assets, "it would have made much more sense to do so when civil litigation was threatened, several years earlier, at a time when [Mr. Coffey] was much more exposed to a larger judgment entering against him." Finally, she claimed that the Trust was created only as "end of the year estate planning, plain and simple."

On May 15, 2007, Judge Coffey met with the attorney for the JCC, Philip T. McLaughlin. During their discussion, which was under oath, Judge Coffey once again asserted that her "primary goal [in creating the Trust] was to spare [her] son the burden of probate duties." She contended that she "did not think that changing the form of real estate ownership, when there were no claims pending or seriously contemplated, was in any way violative of the judicial canons or [her] own personal ethics." However, Judge Coffey stated that she understood the JCC's concerns because "the timing [of the transfers] is really horrific." Moreover, when pressed on the issue of why she was named sole trustee and beneficiary of the Trust, she conceded that she and Mr. Coffey:

did have some conversation about—with all the negative publicity [Mr. Coffey] was getting in the newspapers, about some crazy client coming out of the woodwork and suing, and I suppose that would be an effort to fraudulently convey something to put it out of the reach of some creditor down the road, but we had no information that he had committed any malpractice or had done anything that anyone would come out of the woodwork about, but when things hit the papers, you never know what's going to happen, so we did have that discussion, yes.

On August 15, 2007, the JCC instituted proceedings against Judge Coffey. *See* SUP. CT. R. 40(9). In its formal charge, the JCC asserted, among other things, that "Judge Coffey's conduct reflects certain of the indicia of fraudulent intent as set forth" in the Uniform Fraudulent Transfer Act, *see* RSA ch. 545-A, and that such conduct is a violation of Canons 1 and 2 of the Code of Judicial Conduct. *See* SUP. CT. R. 38.

On October 25, 2007, Judge Coffey entered into a stipulation of facts, acknowledging that she had violated Canons 1 and 2 of the Code. *See* SUP. CT. R. 38. Through this stipulation, Judge Coffey conceded that she: (1) "[k]new or should have known that the [PCC], in the event it prevailed in its action against Mr. Coffey, would be seeking the recovery of fees and costs associated with legal proceedings regarding the disciplining of Mr. Coffey"; (2) "[p]articipated in the declaration of a trust to which Mr. Coffey and Judge Coffey transferred their respective interests in valuable real estate and in which she became Trustee and primary beneficiary"; (3) "[a]ided Mr. Coffey in protecting his assets from the reach of creditors"; and (4) "failed to avoid both impropriety and the appearance of impropriety in participating in the creation of [the T]rust of which she became the sole trustee and in receiving on behalf of the Trustee [*sic*] conveyances of property which extinguished Mr. Coffey's legal interest in real estate which, in turn, may have impeded the collection of a debt owed to the PCC." At around the same time as the stipulation—over two years after the PCC's initial demand—Judge Coffey revoked the Trust, transferred the Washington Road property back to joint tenancy, and refinanced the property in order to pay off the remainder of the PCC's claim.

On December 21, 2007, the JCC issued its report, in which it found that Judge Coffey had engaged in "serious misconduct" and recommended that she be publicly censured, suspended for three months without pay following the conclusion of her current administrative leave, and ordered to reimburse the JCC for its costs. *See* SUP. CT. R. 39(9)(h). As mitigation, the JCC considered the fact that: (1) Judge Coffey has a positive "record and reputation as a jurist," as evidenced "by the number and quality of the letters submitted to the Panel on her behalf"; (2) "the conduct in question

was 'non-judicial' "; (3) she had been "faced with some serious family issues during some portion of the time under consideration"; (4) "she had cooperated with collection counsel for the PCC by providing financial information and with the Panel by responding in writing and voluntarily submitting to a sworn statement"; and (5) by the time of the hearing, "the Trust had been revoked . . . and the property refinanced so that the debt to the PCC had been paid in full."

However, the JCC also noted that, "as a member of the [JCC] for a number of years, Judge Coffey should have been more aware of what would constitute misconduct under the Code and thus expected to acknowledge the full impact of her actions at a far earlier stage of the proceedings." In addition, the JCC stated the following:

> There was concern . . . that although some considerable funds were available after the Supreme Court Order in August of 2005, no attempt at payment was made or compromise offered until contact by collection counsel. Even then another 8 months passed before an agreement was reached, and that after the PCC had voted to refer the matter to the JCC. Beyond that, many members of the Panel expressed concern that Judge Coffey's earlier statements in her letter of January 2, 2007 and her statement to Attorney McLaughlin fell far short of the admissions that were ultimately made in the final Stipulation. Given the above, those voting for the motion felt that counsel's argument of complete cooperation was compromised.

> Counsel further argued that no crime had been committed, there had been no fraudulent activity, and that ultimately the PCC had been made whole. The first statement appears to be accurate. As to the second, while no finding has been made that the transfer of property was fraudulent, Judge Coffey admitted in the Stipulation that she "aided Mr. Coffey in protecting his assets from the reach of creditors[."] As to the third, members of the Panel noted that there is a cost to the judiciary and judicial system by virtue of any judicial misconduct, and that by her Stipulation, Judge Coffey has admitted that her actions "may have impeded the collection of a debt owed to the PCC[,"] thereby incurring additional costs to that Panel.

Judge Coffey urges us to adopt the sanction imposed by the JCC or, in the alternative, to hold that a public censure is sufficient in this case. Counsel for the JCC similarly urges us to adopt the recommended sanction

and additionally requests that we order Judge Coffey to reimburse the JCC for its costs. We turn now to an assessment of the propriety of the recommended sanction.

## II

■ Under the New Hampshire Constitution, it is a privilege, not a right, to hold judicial office. In order to ensure that the "rights of the people" are secure, our constitution permits judges to "hold their offices so long as they behave well." N.H. CONST., pt. I, art. 35. Our constitutional and inherent authority, *see* N.H. CONST. pt. II, art. 73-a; *Smith v. State*, 118 N.H. 764, 770 (1978), as well as our superintending control over the courts, *In re Mussman*, 112 N.H. 99, 101 (1972); *see* RSA 490:4 (1997), includes the power to discipline those judges who fail to maintain this constitutionally mandated standard of behavior. *Opinion of the Justices (Judicial Salary Suspension)*, 140 N.H. 297, 299-300 (1995).

■ This power to discipline and control "the actions of officers of the court . . . [is] absolutely necessary for [us] to function effectively," *State v. LaFrance*, 124 N.H. 171, 179-80 (1983), and to carry out our mandate to "preserve the judicial system," *Opinion of the Justices*, 140 N.H. at 300. Accordingly, we exercise our disciplinary authority not to punish, but rather to "foster[ ] public confidence in the judiciary," *Petition of Thayer*, 145 N.H. 177, 180 (2000), and protect "the public from further acts of misconduct," *Snow's Case*, 140 N.H. 618, 621 (1996); *see also Adams v. Com'n on Judicial Performance*, 897 P.2d 544, 569 (Cal. 1995). It was pursuant to our constitutional, statutory, and inherent authority to discipline that "[w]e promulgated Supreme Court Rule 39, establishing and describing the [JCC], and Supreme Court Rule 40, outlining the [JCC]'s procedural rules." *Snow's Case*, 140 N.H. at 622.

■ "Our role on review of the [JCC]'s factual findings is not to review the evidence anew, but to determine whether a reasonable person could have found as the committee did based on the evidence before it, that is, to determine if its conclusion is supported by the record." *Id.* (citations omitted); *see also* SUP. CT. R. 40(11) (explaining how a violation of the Code must be proved by "clear and convincing evidence"). But our responsibility as supervisor of the courts "includes the authority to determine how best to regulate [judicial] conduct, and therefore encompasses the discretion to determine when, whether and to what extent discipline should be imposed." *Petition of Judicial Conduct Comm.*, 151 N.H. 123, 126 (2004) (citation omitted). Thus, we consider the question of sanction *de novo*, *Snow's Case*, 140 N.H. at 622, and base our decision upon what we deem to be "just and proper." SUP. CT. R. 40(13).

In the matter before us, it was stipulated that Judge Coffey's conduct amounted to a violation of Canons 1 and 2 of the Code of Judicial Conduct. *See* SUP. CT. R. 38. Because Judge Coffey's breach of these provisions of the Code is not disputed, our inquiry is limited to "the more difficult task of determining an appropriate sanction." *In re Krepela*, 628 N.W.2d 262, 271 (Neb. 2001). Before engaging in that undertaking, however, we must first address a preliminary matter: to wit, the absence of standards to which the JCC, and ultimately this court, can turn for guidance in determining sanction. *See* SUP. CT. R. 40(12)(d).

### III

Currently, the JCC is required to consider each case using only a limited body of precedent, the Code and its own conscience as guidance. We believe that a "framework is needed to ensure a level of consistency necessary for fairness to the public and the legal system." *In re Inquiry Concerning a Judge*, 788 P.2d 716, 723 (Alaska 1990) (quotation omitted). By articulating a set of principles to govern judicial discipline matters, we can better enable the JCC to ensure that equivalent cases are treated in an equivalent manner. *See In re Brown*, 626 N.W.2d 403, 405 (Mich. 2001). Furthermore, imposition of a set of standards "will allow this Court to more meaningfully review the [JCC]'s disciplinary recommendations." *Id.*

Recognizing the necessity for some form of analytical framework in this area, the Alaska Supreme Court has decided to analogize to the four-prong test in the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) (STANDARDS) "insofar as possible when sanctioning judges." *Inquiry Concerning a Judge*, 788 P.2d at 723. Thus, that court first fashions a baseline sanction by considering the ethical duty the judge has violated, the judge's mental state, and the actual or potential injury occasioned by the judge's conduct. *Id.* at 724; *see also Grew's Case*, 156 N.H. 361, 365 (2007). The court then considers the effect, if any, that mitigating and aggravating factors will have on that baseline sanction. *Inquiry Concerning a Judge*, 788 P.2d at 724.

In their briefs, the parties appear to have presumed that we would adopt an approach similar to the Alaska Supreme Court's. However, while we have followed the STANDARDS in the attorney discipline realm, *see, e.g.*, *Grew's Case*, 156 N.H. at 365, we believe their application in this context would be problematic. The efficacy of the STANDARDS is largely contingent upon its baseline sanctions, which were crafted with the rules of professional conduct governing lawyers in mind. This poses a problem because, as we have previously observed, "[t]he rules of judicial conduct and the rules of professional conduct are not *in pari materia.*" *Thayer*, 145 N.H. at 183; *see also In the Matter of Del Rio*, 285 N.W.2d 277, 282 (Mich. 1979) (finding

"dubious the notion that judicial or attorney misconduct cases are comparable beyond a limited and superficial extent"). Because they assume a heightened station in our society, judges must maintain a standard of personal and professional conduct above that expected of attorneys. *See Snow's Case*, 140 N.H. at 621 (explaining that "the judiciary in particular" must maintain "the strictest integrity" (quotation omitted)); *see also Inquiry Concerning a Judge*, 788 P.2d at 723 n.11 (acknowledging that "[t]he [STANDARDS] are limited in analogical scope because judges are held to a higher level of scrutiny than are ordinary lawyers"); *In re Inquiry Relating to Rome*, 542 P.2d 676, 682 (Kan. 1975). It is, thus, conceivable that in many cases a judge may be subject to a more severe baseline sanction than that imposed upon an attorney under the STANDARDS for the same conduct.

■ Moreover, the STANDARDS fail to adequately address situations where, as here, a judge's conduct has created "an appearance of impropriety." SUP. CT. R. 38; *see Inquiry Concerning a Judge*, 788 P.2d at 725. Indeed, the STANDARDS generally require a finding that an attorney acted negligently, intentionally or with knowledge before discipline can be imposed. *See, e.g.*, STANDARDS, *supra* s. II, at 6; *Grew's Case*, 156 N.H. at 366. In contrast, a judge can be subject to discipline for simply creating an appearance of impropriety, irrespective of the judge's mental state. *See Snow's Case*, 140 N.H. at 624 ("Whether an appearance of impropriety exists is determined under an objective standard, *i.e.*, would a reasonable person, not the judge himself, question the impartiality of the court." (quotation omitted)). For these reasons, adoption of the STANDARDS in this context would cause more confusion than clarity.

Other courts that have attempted to provide a framework for the sanction analysis have typically opted to consider each instance of judicial misconduct with a set of principles or factors in mind, and then place the case into context by comparing it with prior cases. *See, e.g., In re Brown*, 626 N.W.2d at 405 (articulating a set of factors that differentiates the various gradations of judicial misconduct); *Miss. Com'n on Jud. Performance v. Gibson*, 883 So. 2d 1155, 1158 (Miss. 2004) (articulating a list of six factors to be considered when determining the sanction in a judicial misconduct case); *Matter of Deming*, 736 P.2d 639, 659 (Wash. 1987) (culling a list of ten "non-exclusive" factors to be considered in each judicial discipline case); *In re Chaisson*, 549 So. 2d 259, 266 (La. 1989) (adopting the *Deming* factors).

■ The American Judicature Society (AJS) has conducted a study of all judicial conduct decisions reported between 1990 and 2001, and distilled a list of the factors most commonly considered. *See* C. GRAY, AMERICAN

JUDICATURE SOCIETY: A STUDY OF STATE JUDICIAL DISCIPLINE SANC-
TIONS 77-82 (2002) (AJS STUDY). Because this study is comprehensive and
the factors it articulates encapsulate the myriad of considerations relevant
to the sanction inquiry, we adopt the five factors provided in the AJS
STUDY. Accordingly, in determining the sanction in judicial misconduct
cases, we will consider: (1) "[t]he nature of the misconduct"; (2) "[t]he
extent of the misconduct"; (3) "[t]he judge's culpability"; (4) "[t]he judge's
conduct in response to the [JCC]'s inquiry and [the commencement of]
disciplinary proceedings"; and (5) the judge's reputation and record on the
bench. AJS STUDY, *supra* at 81-82; *see* SUP. CT. R. 38, Preamble (dictating
that the degree of discipline "should be determined through a reasonable
and reasoned application of the [Code] and should depend on such factors
as the seriousness of the transgression, whether there is a pattern of
improper activity and the effect of the improper activity on others or on the
judicial system"). We begin by briefly discussing some of the relevant
considerations under each factor.

██ ██ First, the nature of the judge's misconduct must be determined.
AJS STUDY, *supra* at 81. This requires an identification of the specific
canon violated and a determination as to whether the offensive conduct
"occurred in the judge's official capacity or in the judge's private life." *Id.*;
*see Deming*, 736 P.2d at 659. In general, "misconduct on the bench is . . .
more serious than the same misconduct off the bench." *Brown*, 626 N.W.2d
at 405. Under this factor we also consider "whether the judge acted in bad
faith, good faith, intentionally, knowingly, or negligently." AJS STUDY,
*supra* at 81. Even though all degrees of intent can warrant judicial
discipline, *Snow's Case*, 140 N.H. at 624; *see also Matter of Larsen*, 616
A.2d 529 (Pa. 1992), the judge's mental state is salient because: (1)
misconduct that is motivated by "personal profit, vindictiveness, or other
dishonest" motive is more egregious than that "motivated by compassion
for others," AJS STUDY, *supra* at 81; *cf. Miss. Com'n on Jud. Performance
v. Dodds*, 680 So. 2d 180, 190-200 (Miss. 1996); and (2) misconduct that is the
result of deliberation is generally more serious than that of a spontaneous
nature. AJS STUDY, *supra* at 81; *Brown*, 626 N.W.2d at 405.

██ Second, the extent of the judge's misconduct must be assessed. AJS
STUDY, *supra* at 82; *Gibson*, 883 So. 2d at 1158. Central to this inquiry is a
determination of the degree of actual or potential harm occasioned by the
judge's conduct. This harm can take the form of "harm to the court system,
to litigants, . . . to the public's perception of the fairness of the judicial
system," or "indirect economic detriment to the public." *Id.*; *see also
Inquiry Concerning a Judge*, 462 S.E.2d 728, 736 n.13 (Ga. 1995) (noting
that the costs to the judicial system arising from a judge's suspension

should be given at least some consideration). Whether the misconduct was an isolated act or an ongoing series of acts is also relevant. *See Deming*, 736 P.2d at 659; AJS STUDY, *supra* at 82.

██ ██ The third factor requires analysis of the judge's level of culpability. AJS STUDY, *supra* at 82. Under this factor, the circumstances that had, or should have had, an effect upon the judge's decision-making process must be taken into account, such as whether there is precedent expressly forbidding the behavior in question, *see In re Marullo*, 692 So. 2d 1019, 1023 (La. 1997), or whether the judge was warned of the impropriety of her conduct and failed to heed such warnings, AJS STUDY, *supra* at 82; *see also Matter of Fleischman*, 933 P.2d 563, 569 (Ariz. 1997); *Matter of King*, 568 N.E.2d 588, 599 (Mass. 1991). Application of this factor will also typically include an assessment of whether the judge was: (1) "suffering from personal or emotional problems"; (2) "suffering from physical or mental disability"; or (3) impaired by alcoholism or some other addiction. AJS STUDY, *supra* at 82. Such impairments to the judge's faculties can operate as mitigation—as in cases where the hindrance was only temporary and is no longer of consequence—or aggravation—as in cases where the condition persists and, thus, continues to affect the judge's fitness to fulfill her responsibilities.

██ Fourth, we consider the actions taken by the judge in response to the JCC's inquiry and the commencement of disciplinary proceedings. AJS STUDY, *supra* at 82. Relevant here is whether the judge was candid and forthcoming, or attempted to subvert the JCC's investigation by presenting false evidence or giving false testimony. *Id.*; *see Matter of Perry*, 385 N.Y.S.2d 589, 589 (App. Div. 1976) (removing a judge for, primarily, lying under oath to the investigatory panel during his judicial misconduct proceedings), *appeal dismissed*, 360 N.E.2d 964 (N.Y. 1976). We also give weight to a judge's acknowledgement "that the acts occurred," *Deming*, 736 P.2d at 659, and acceptance of responsibility by showing remorse, AJS STUDY, *supra* at 82, as such an expression of remorse can justify mitigation when resulting from a genuinely penitent mind. *Cf. Snow's Case*, 140 N.H. at 628 (rejecting judge's offer of remorse as having arisen out of fear of sanction, and not the realization that he had erred). In contrast, a "[h]alf-hearted attempt[ ] at remedial action" will not mitigate the sanction. AJS STUDY, *supra* at 70.

██ Finally, the judge's reputation and record on the bench must be given its due weight. AJS STUDY, *supra* at 82; *see also Gibson*, 883 So. 2d at 1158. *Compare In re Krepela*, 628 N.W.2d at 271 (offering a judge's long, unblemished record as sufficient mitigation to prevent removal), *with In re*

*Elliston*, 789 S.W.2d 469, 480 (Mo. 1990) (en banc) (explaining that evidence of a judge's "good conduct, to which others testified, does not disprove" the existence of misconduct, but rather "shows that his conduct is not universally contrary to the" Code). Under this factor, the judge's reputation is determined by looking at, for example: (1) "[p]ositive contributions made by the judge to the court and the community"; (2) "[t]he judge's commitment to fairness and innovative procedural reform"; and (3) "[t]he judge's ability to fairly, effectively, and efficiently run a court with a heavy caseload." AJS STUDY, *supra* at 82. Similarly relevant is "[w]hether the judge was experienced and[, thus,] should have been familiar with the high standards established for judicial behavior." AJS STUDY, *supra* at 82. In certain cases, lack of experience may be a mitigating factor if inexperience partially accounts for the offensive conduct. *Cf. Grew's Case*, 156 N.H. at 367 (holding that inexperience in the practice of law is only valid as mitigation in the attorney misconduct realm where the offending conduct has resulted therefrom). If the judge has been previously sanctioned, that too must be weighed. AJS STUDY, *supra* at 82.

## IV

While this precise analytical framework was not the controlling law when the JCC issued its decision or the parties filed their briefs, the JCC and the parties have addressed the essence of each factor. Therefore, we now apply the analytical framework to the matter before us.

As noted above, Judge Coffey has stipulated that she violated Canons 1 and 2 of the Code. SUP. CT. R. 38. In relevant part, Canon 1 provides:

> *A Judge Should Uphold the Integrity and Independence of the Judiciary.* An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code should be construed and applied to further that objective . . . .

SUP. CT. R. 38, Canon 1. Canon 2 of the Code states, in pertinent part:

> *A Judge Should Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities* . . . . A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

SUP. CT. R. 38, Canon 2(A). The JCC determined that Judge Coffey's breach of these ethical mandates was "serious misconduct."

██ In properly characterizing the nature of the misconduct under the first factor, *see* AJS STUDY, *supra* at 81, we must assess the validity of the JCC's conclusion that this was "serious misconduct," *see Snow's Case*, 140 N.H. at 623 (explaining how "we review the record in its entirety . . . to determine whether . . . [a] violation [of the Canons] is serious"), by first looking beyond the particular Code provisions that were violated and characterizing the underlying conduct. On this issue, Judge Coffey asserts, as part of her argument for mitigation, that "[t]he statement of charges did not allege, nor was there ever any finding, that the 2003 trust and deeds were fraudulent conveyances within the meaning of " RSA chapter 545-A. We believe this claim is at odds with the record.

██ First, while the statement of formal charges did not explicitly state that the creation of the Trust was fraudulent, several passages have an equivalent effect. For instance, in a section entitled "Fraud of Creditors," the formal charges state that "RSA 545-A establishes certain standards pertaining to debtor-creditor relations which . . . constitute[ ] an expression of public policy which applies in considering Judge Coffey's conduct." Even more to the point, in another section the formal charges assert that the timing and effects of the creation of the Trust "do not support Judge Coffey's claim of innocent coincidence but, rather, support a conclusion of intentional cooperation with Mr. Coffey to impede collection of debts including expenses as ordered by" this court. Thus, the formal charges conclude, "Judge Coffey's conduct reflects certain of the indicia of fraudulent intent" in RSA 545-A. Together, these assertions clearly amount to an allegation that the underlying transfers were fraudulent.

Second, there has been no "finding" of a fraudulent conveyance because there has not yet been an occasion specifically requiring one. The fraudulent conveyance statute bestows upon creditors a right to file suit in order to void a fraudulent transfer "to the extent necessary to satisfy the creditor's claim." RSA 545-A:7, I(a) (2007). The creditor in this case, the PCC, was able to satisfy its claim without resorting to suit, thus obviating the need for a specific "finding" of fraudulent conveyance.

The JCC's failure to explicitly state that the conveyance was fraudulent is also of little consequence. It was only in response to Judge Coffey's assertion "that there had been no fraudulent activity," that the JCC found it necessary to note that, "while no finding has been made that the transfer of property was fraudulent, Judge Coffey admitted in the Stipulation that she 'aided Mr. Coffey in protecting his assets from the reach of creditors.' " Reasonably read, this passage merely demonstrates that the JCC did not believe that an explicit finding on the issue of intent to defraud was necessary in light of Judge Coffey's admission that she had aided her

husband in protecting his assets from creditors. *See Edwards v. RAL Automotive*, 156 N.H. 700, 705 (2008) ("The interpretation of final judgments, like the interpretation of other written documents, is a question of law, which we review *de novo*.").

In any event, an order stating unequivocally that the conveyance was fraudulent is not required for us to find, for purposes of this disciplinary proceeding, that Judge Coffey was complicit in a fraudulent conveyance. *Cf. Eshleman's Case*, 126 N.H. 1, 5 (1985) (holding that "the critical fact prompting final disciplinary action is not the fact of conviction or indictment, but the underlying conduct giving rise to that indictment or conviction" (citation omitted)). It is well within our authority, and indeed part of our duty in properly characterizing the misconduct, to take the facts as found and determine their legal consequences. *Cf. Snow's Case*, 140 N.H. at 622-23; *Appeal of Tennis*, 149 N.H. 91, 93 (2003) (statutory interpretation is a question of law which we review *de novo*). Because the JCC failed to make an explicit finding on the issue of fraud, and because Judge Coffey has offered this failure as mitigation, we must now determine, based upon the facts found by the JCC, whether the underlying transfers were fraudulent conveyances.

Under the New Hampshire Fraudulent Transfer Act, "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose *before or after* the transfer was made . . . if the debtor made the transfer . . . [w]ith *actual intent* to hinder, delay, or defraud any creditor of the debtor." RSA 545-A:4, I(a) (emphases added). It is undisputed that the Coffeys transferred all of their interests in real property out of Mr. Coffey's name and into the Trust, under which Judge Coffey was both the sole trustee and the sole beneficiary. *See* RSA 545-A:1, XII (defining "transfer" broadly to include every "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset"). In addition, as noted above, Judge Coffey has stipulated that she "[a]ided Mr. Coffey in protecting his assets from the reach of creditors." Therefore, the only question is whether the transfers were made "[w]ith actual intent to hinder, delay, or defraud *any* creditor," as those terms are used under the Fraudulent Transfer Act. RSA 545-A:4, I(a) (emphasis added).

In resolving this issue, we note first that Judge Coffey admitted to the JCC prosecutor that she and Mr. Coffey decided to transfer all of the property into her sole name because, at least in part, they were concerned about "some crazy client coming out of the woodwork and suing [Mr. Coffey]." Judge Coffey acknowledged that making these transfers with such a consideration in mind could be construed as "an effort to fraudu-

lently convey something to put it out of the reach of some creditor down the road." Arguably, these admissions alone are sufficient to find "actual intent," as all that is required under the statute is an intent to hinder, delay or defraud *any* creditor, not necessarily the one who is ultimately defrauded. RSA 545-A:4, I(a).

Even assuming such admissions are insufficient, however, we can "infer fraudulent intent from the circumstances surrounding the transfer." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991) (explaining how the common law of fraudulent conveyance, as well as section 548 of the Bankruptcy Code, recognize certain "badges of fraud" as evidence of actual fraudulent intent); *see also In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983). As debtors will rarely admit an intent to hinder, delay or defraud a creditor, courts have long considered objective "badges of fraud" in determining the existence of fraudulent intent. *See, e.g., In re Sharp Intern. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (in fraudulent conveyance action, pleader may rely upon objective badges of fraud to support inference of actual fraudulent intent); *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994) (determination that debtor had actual intent to fraudulently transfer property can be made based upon undisputed material facts); *see also In re Marrama*, 445 F.3d 518, 522 (1st Cir. 2006) ("[I]n certain cases, circumstantial evidence may be sufficiently potent to establish fraudulent intent beyond hope of contradiction.").

Under our statutory scheme, such "badges of fraud" include whether: (1) "The transfer . . . was to an insider," RSA 545-A:4, II(a); (2) "The debtor retained possession or control of the property transferred after the transfer," RSA 545-A:4, II(b); (3) "Before the transfer was made . . . , the debtor had been sued or threatened with suit," RSA 545-A:4, II(d); (4) "The transfer was of substantially all the debtor's assets," RSA 545-A:4, II(e); and (5) "The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred," RSA 545-A:4, II(h). While "[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254-55 (citations omitted).

These "badges of fraud" clearly point towards a finding of fraudulent intent in this case: First, the transfers were made between Mr. Coffey and Judge Coffey, who are spouses and thus "insiders." *See* RSA 545-A:4, II(a); RSA 545-A:1, VII(a) (defining "insider" in this context to include relatives). Second, the record indicates that the Coffeys retained possession and

control of the Washington Road property after the transfer and received the benefits and enjoyment of the improvements that were occasioned by the sale of the other Trust assets. *See* RSA 545-A:4, II(b). Third, before the transfers were made, the PCC proceedings against Mr. Coffey had already commenced and Judge Coffey has stipulated that she "[k]new or should have known that the [PCC], in the event it prevailed in its action against Mr. Coffey, would be seeking the recovery of fees and costs associated with" those proceedings. *See* RSA 545A:4, II(d). Fourth, as evidenced by his assertion of indigence in the financial affidavit submitted to the PCC, the transfer was of substantially all of Mr. Coffey's assets. *See* RSA 545-A:4, II(e); *see also Kardynalski v. Fisher*, 482 N.E.2d 117, 122 (Ill. App. Ct. 1985) (explaining how, when considering whether a fraudulent conveyance has occurred, "[s]pecial scrutiny [must be] applied to transfers between spouses where the debtor spouse is thereby rendered insolvent and unable to satisfy the claims of his creditors"). And, finally, at least two of the transfers were made for no consideration. *See* RSA 545-A:4, II(h).

In light of these facts, as well as Judge Coffey's admission of some intent to defraud potential future creditors and her concession in her brief that the PCC proceedings had caused her concern for her family's "emotional and financial security," we conclude that the record sufficiently demonstrates that Judge Coffey was complicit in a fraudulent transfer. *See Estes v. Titus*, 731 N.W.2d 119, 130-34 (Mich. Ct. App. 2006) (finding that a judgment creditor had a valid claim under the Uniform Fraudulent Transfer Act where the judgment debtor had, prior to conclusion of the underlying case, entered into a consent divorce that transferred all of his assets to his former wife, thus making him insolvent), *appeal granted*, 731 N.W.2d 423 (Mich. 2007). By participating in the fraudulent conveyances, Judge Coffey contravened the public policies embodied in RSA 545-A:4, *see Matter of Seaman*, 627 A.2d 106, 122 (N.J. 1993) (holding that a judge's infringement of an important public policy is grounds for aggravation); SUP. CT. R. 38, Canon 2 ("A judge shall respect . . . the law"), and, at minimum, created an appearance of impropriety. *See* SUP. CT. R. 38.

But, in addition to her complicity in the creation of the Trust, we are also troubled by Judge Coffey's actions in apparent disregard of our order mandating repayment of the PCC's expenses. As the JCC observed, "although some considerable funds were available after the Supreme Court Order in August of 2005, no attempt at payment was made or compromise offered until contact by collection counsel." To be sure, of the approximately $263,000 the Coffeys spent on improvements to the Washington Road property, *at least* $110,000 was spent following our August 12, 2005 order. While, as we noted above, the sparse record as to the necessity of the

expenditures limits our review, we believe the JCC is correct in its implicit finding that Judge Coffey should have been both more forthright in disclosing the existence of the Trust and more cooperative with the PCC in attempting to settle the claim earlier. In light of the foregoing, we concur with the JCC's determination that this case involves "serious misconduct."

■ Beyond identifying the specific canon violated and categorizing the underlying conduct, determining the nature of the misconduct also requires examination of whether the conduct occurred in a judicial or personal capacity. *See* AJS STUDY, *supra* at 81; *Deming*, 736 P.2d at 659. Despite the serious nature of her misconduct, the JCC considered as mitigation the fact that the underlying conduct "occurred in the context of Judge Coffey's personal affairs." The JCC is undoubtedly correct that the Trust was not created by Judge Coffey in her official capacity and, thus, would normally be regarded as less severe than conduct committed on the bench. *See Brown*, 626 N.W.2d at 405; *see also Grew's Case*, 156 N.H. at 368-69 (explaining how the line drawn between private and official misconduct "is drawn for the purpose of increasing the sanction given to" those who commit misconduct in their official capacity). Here, however, Judge Coffey's complicity in the creation of the Trust and her subsequent use of Trust assets thwarted the efforts of the PCC, an arm of this court, to collect its debt. Moreover, the existence of the Trust placed the proceeds from the sale of the condominium and the refinancing of the Washington Road property beyond the PCC's reach and, thus, stalled the execution of this court's order granting the PCC reimbursement. Therefore, this conduct, while technically private, affected the administration of justice. *Cf. Brown*, 626 N.W.2d at 405 (explaining how misconduct that is prejudicial to the administration of justice is more severe than misconduct that only implicates the appearance of impropriety). Consequently, the JCC erred in finding that the non-judicial nature of Judge Coffey's conduct warranted mitigation.

■ Finally, determining the nature of the conduct also requires us to examine whether Judge Coffey's conduct stemmed from "dishonest or selfish motives." AJS STUDY, *supra* at 81. Judge Coffey admittedly transferred the assets into the Trust, at least in part, to shield them from some prospective creditor of her husband. After we issued our order requiring that the PCC be repaid, Judge Coffey sold the condominium and, in addition, withdrew equity from the Washington Road property. She then used the proceeds from these transactions to make improvements to, and build further equity in, the Coffeys' private residence. Accordingly, we find that the record sufficiently demonstrates that Judge Coffey's conduct stemmed from selfish motives.

With respect to the second factor—the extent of actual or potential harm caused by the misconduct—the JCC found that the conduct in question caused the PCC to incur unnecessary costs in recovering its debt and injured both the integrity and public perception of the judiciary. We agree. While the creation of the Trust was an isolated event, *see In re Deming*, 736 P.2d at 659, it is axiomatic that judges "must comply with the law, including the provisions of th[e] Code." SUP. CT. R. 38, Canon 1 commentary. "Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility." *Id.* As noted above, this case involves conduct that both breaches Canons 1 and 2 of the Code and offends the public policies embodied in RSA chapter 545-A. Despite the belated revocation of the transfers to the Trust, and the fact that the PCC's debt was ultimately satisfied, this conduct tarnished Judge Coffey's reputation as a jurist and brought the judiciary as a whole into disrepute. *See id.* (explaining how a "violation of th[e] Code diminishes public confidence in the judiciary and thereby does injury to the system of government under law"). We therefore reject Judge Coffey's assertion that her conduct resulted in "no harm to any one [*sic*]," and accept the JCC's findings.

With respect to the third factor—the judge's level of culpability—we agree with the JCC's finding "that Judge Coffey was faced with some serious family issues during *some portion* of the time under consideration." (Emphasis added.) Contemporaneous with the creation of the Trust, Judge Coffey was dealing with the stress occasioned by the notoriety of the proceedings against her husband, her husband's loss of income, her mother's diagnosis of Alzheimer's disease, and her father's hospitalization for depression and, ultimately, his death. Although not all of these issues persisted throughout the time in question, they indisputably affected Judge Coffey's judgment at the time that she entered into the Trust. We, therefore, acknowledge that Judge Coffey's culpability is abated to some degree by the existence of personal and emotional problems.

The JCC also observed that "as a member of the [JCC] for a number of years, Judge Coffey should have been more aware of what would constitute misconduct under the Code." As noted by Judge Coffey, the suggestion that misconduct committed by a former JCC member is *automatically* more severe "is an unfair criticism, in that all judges should be held to the same high standard." *See* SUP. CT. R. 38 (applying the commands of the Code to all "judges"). We agree that there is no basis for subjecting a former member of the JCC to a heightened standard, absent some showing that her position made her aware that her misconduct was

offensive to the Code. *Cf. Fleischman*, 933 P.2d at 569 (holding that consideration may be given to whether a judge was informed of the impropriety of her actions).

However, despite Judge Coffey's assertions to the contrary, the JCC did not aggravate her sanction merely because she was a former member of the JCC, but rather because she was a member "for a number of years." The distinction is crucial because, as we have previously held in the attorney discipline realm, substantial experience can "justify an *increase* in the degree of discipline to be imposed." *Basbanes' Case*, 141 N.H. 1, 8 (1996) (holding that an attorney's twenty-eight years of experience appearing before courts should have served to heighten his knowledge as to the appropriateness of his representations) (quotation omitted); *see also Coffey's Case*, 152 N.H. at 515; *Jones' Case*, 137 N.H. 351, 360 (1993). The logic supporting an increase in sanction for attorneys with substantial experience applies with equal force to judges with substantial experience. *Cf. In re Gallagher*, 951 P.2d 705, 716 (Or. 1998) (finding that a judge's substantial experience "at the time of the charged conduct" evidenced that the judge "was well familiar with the high standards of behavior that the privilege of judicial service demands"). Accordingly, the JCC properly considered Judge Coffey's experience on the JCC as an aggravating factor.

The fourth factor requires consideration of the actions Judge Coffey took in response to the JCC investigation. Under this factor, we must consider whether the judge was candid or less than forthcoming, AJS STUDY, *supra* at 82; *see also* SUP. CT. R. 40(8)(e) ("judges . . . shall comply with the reasonable requests of the [JCC] for assistance and cooperation in the conduct of any investigation by the [JCC]"), and whether the judge has acknowledged that the acts occurred by showing remorse, AJS STUDY, *supra* at 82. Here, Judge Coffey asserts that she made "timely good faith effort[s] to . . . rectify [the] consequences of [her] misconduct" and "cooperated completely" with "both the Professional Conduct Committee and the Judicial Conduct Committee." Judge Coffey also contends that mitigation is warranted because she has amply demonstrated that she is remorseful. We address each of her arguments in turn.

Mitigation for cooperation is not warranted when a judge has been helpful in some respects and obstructive in others. *See Nardi's Case*, 142 N.H. 602, 608 (1998) ("cooperation is a mitigating factor only when total and complete"). With respect to Judge Coffey's cooperation with the PCC, we share the JCC's concern that, "although some considerable funds were available after [our order granting reimbursement to the PCC], no attempt at payment was made or compromise offered until" the Coffeys received Niederman's letter, nearly eight months after our order. Judge Coffey

asserts that she has been completely cooperative in that she assisted Niederman and "never interposed the existence of the [T]rust to impede the PCC's collection efforts." However, the fact remains that Judge Coffey was aware of the PCC debt, was aware that no efforts were being made at repayment, and, in spite of this knowledge, sold the condominium, refinanced the Washington Road property, and applied the proceeds to her benefit. The record does not show that either of the Coffeys informed the PCC of this transfer, even though the condominium was a valuable asset that could have permitted the PCC some recovery. *See* 5 R. WIEBUSCH, NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 60.20, at 486 (1984) (explaining how "a judgment creditor's right to payment of money may be satisfied by execution against the judgment debtor's interests in real estate"). Moreover, the PCC's debt was not settled until November of 2006, *after* Judge Coffey learned of the PCC's intention to refer the matter to the JCC. Therefore, even though she provided the documents requested by Niederman and entered into the settlement agreement, we cannot find that Judge Coffey was sufficiently cooperative with the PCC to warrant mitigation.

Nor can we find, on this record, that Judge Coffey completely cooperated with the JCC. The JCC observed that Judge Coffey had not "complete[ly] cooperat[ed]" in the investigation of this matter because her "earlier statements . . . fell far short of the admissions that were ultimately made." The record supports this finding. In her first correspondence with the JCC, Judge Coffey broadly asserted that she "never had ANY intention of avoiding ANY debt, current or prospective, when the trust was signed and later recorded." It was not until she gave testimony to the JCC prosecutor, nearly five months into the JCC investigation, that she conceded that she and Mr. Coffey had some discussions regarding the prospect of "some crazy client coming out of the woodwork and suing" Mr. Coffey. While we acknowledge that Judge Coffey continually maintained throughout the proceeding that "[i]t was never [her] intention to thwart a court order or impede the collection of any *just* debt," (emphasis added), her statements in her earlier letter do indeed conflict with her final acceptance that she and Mr. Coffey had considered at least some prospective debt.

In addition, we also note that there were instances when Judge Coffey's statements bordered on misleading. For example, during the JCC hearing, Judge Coffey was questioned as to why none of the $77,635.96 she received in refinancing the Washington Road property was offered to the PCC. She replied that it was because they paid other "more imminent" debts. When pressed by a JCC panel member to explain why the other debts "were deemed more [of a] priority than the PCC obligation," Judge Coffey testified that it was "[b]ecause the bank wouldn't [lend the money] unless

the credit card debts were paid down." She then went on to tell the JCC members that she did not "think" there was any cash realized from the refinancing, but that "if there was, Attorney Niederman had all th[e] records." In fact, the record demonstrates that only $20,502 was used to pay off the credit card debt, and that approximately $38,546 was spent paying contractors for work on the Washington Road property.

Moreover, during her discussions with the JCC prosecutor, Judge Coffey represented that she and her husband "put real estate into the [Trust], and that was about it." However, in addition to their real estate, as noted above, the Coffeys also transferred into the Trust a nominal amount of cash and essentially all the contents of the Pioneer Road property, the Washington Road property, and the condominium. Thus, in contrast to Judge Coffey's representations, the Trust was funded with a significant portion of the Coffeys' assets, real and personal. Accordingly, we concur with the JCC's implicit finding that Judge Coffey was less than forthright, *see* AJS STUDY, *supra* at 82 (explaining how consideration should be given to whether a judge has offered an unlikely defense), and find that she made evasive and misleading statements to the JCC. *See Fitzpatrick's Case*, 132 N.H. 211, 218 (1989) (finding that an attorney who attempts to mislead the PCC cannot be found to have fully cooperated); *see also Basbanes' Case*, 141 N.H. at 7 ("We cannot give the respondent credit for cooperating with the disciplinary process when he misle[d] the referee about the extent of his misconduct."). We therefore reject Judge Coffey's argument that she "completely cooperated" with the JCC.

Apart from "express[ing] concern[ ] that Judge Coffey's earlier statements in her letter of January 2, 2007 and her statement to Attorney McLaughlin fell far short of the admissions that were ultimately made in the final Stipulation," the JCC appears to have given deference to Judge Coffey's credibility. The JCC did not find that Judge Coffey had lied and, indeed, went so far as to find that she had "cooperated" by "responding in writing and voluntarily submitting to a sworn statement."

██ For us to look beyond the JCC's finding and conclude that Judge Coffey lied or deliberately deceived the JCC would require us to undertake an independent review of her credibility. Our well-settled rule is to refrain from engaging in such an inquiry out of recognition that "[t]he credibility and weight to be given to a witness' testimony is a question of fact for the trial court." *Rancourt v. Town of Barnstead*, 129 N.H. 45, 50 (1986). Even when a witness has made apparently inconsistent statements, to conclude that the witness in essence committed perjury requires a probing of the witness' subjective motivations. Without an opportunity to observe the witness' demeanor, we are ill-suited to determine deliberate deception in

the first instance. *See id.* (explaining how the reasonably made findings of the trial court as to the witness' veracity for truth must be permitted to stand).

That is why, for example, our settled practice in attorney discipline cases is to use an attorney's deliberate deception as an aggravating factor only when the PCC has already determined the lawyer lied. *See, e.g., Cohen's Case*, 143 N.H. 169, 171-72 (1998) (disbarring attorney based upon referee's finding that the attorney had repeatedly engaged in dishonest conduct, including, among other things, falsely answering bar counsel's interrogatory); *Astles' Case*, 134 N.H. 602, 605 (1991) (holding that aggravation was warranted where respondent admitted, and the referee found, that the respondent had lied in correspondence to the PCC). In none of our cases have we, in the first instance, engaged in an independent review of the record, found that a lawyer lied, and then considered that fact in determining an appropriate sanction. For similar reasons, we decline to do so here.

█ Finally, Judge Coffey also contends under this factor that she is entitled to mitigation because she has demonstrated that she is remorseful. Judge Coffey's counsel put forward the same argument to the JCC in the hearing memorandum. Similarly, in her final written statement to the JCC, Judge Coffey asserted that she was "deeply and most sincerely apologetic." However, after reviewing all of the evidence and listening to Judge Coffey's testimony, the JCC made no finding of remorse. *Cf. Snow's Case*, 140 N.H. at 628 (refusing to mitigate the judge's sanction where his late expression of remorse stemmed primarily from the prospect of being sanctioned, and "not from any recent realization of" the seriousness of his conduct). We see no reason, based upon this record and our foregoing analysis, to deviate from the JCC on this matter.

█ Under the last factor, we must give Judge Coffey's reputation and record on the bench its due weight. As evidence of her positive reputation, Judge Coffey has submitted twenty-five letters written by family friends, practicing attorneys, and current and former judges. While many of these supporters declined to comment on the conduct at issue here, the overwhelming and unanimous sentiment in these letters is that Judge Coffey is a conscientious, efficient and professional judge. In addition, the record indicates that Judge Coffey has spent several years working with the New Hampshire Bar Association's "Lawyer in Every School" program and has been heavily involved with societies engaged in the advancement of the legal profession, including the American Inns of Court. While Judge Coffey was previously brought before the JCC with regard to allegations that she had fallen asleep on the bench, those charges were ultimately dismissed as

baseless and Judge Coffey was not sanctioned. AJS STUDY, *supra* at 82. Thus, we agree with the JCC that this factor is favorable to Judge Coffey.

In sum, we conclude under the first factor that Judge Coffey has engaged in serious misconduct by participating in a fraudulent conveyance and ignoring the commands of a court order. While these acts occurred in her private life, the JCC nevertheless erred in considering this fact as mitigation because the underlying conduct affected the administration of justice. We concur with the JCC's finding that Judge Coffey's conduct caused actual damage to the integrity and public perception of the judiciary, and acknowledge that Judge Coffey was suffering from emotional stress during some portion of the time in question. The JCC also erred to the extent that it held Judge Coffey was entitled to mitigation for cooperation. That finding is unsupported by the record and indeed conflicts with the JCC's finding that she was not completely forthright. Finally, we agree with the JCC that Judge Coffey is entitled to mitigation based upon her admirable reputation and record on the bench.

Because the JCC gave insufficient weight to the fact that the underlying conveyances were fraudulent and that Judge Coffey acted with disregard for a valid court order, and because it gave undue weight to Judge Coffey's cooperation, we hold that a sanction far more severe than the recommended three-month suspension is required "to protect the integrity of the judiciary." *Snow's Case*, 140 N.H. at 621.

## V

■ Determining what constitutes an appropriate sanction is not an easy task. No matter how formulaic the analysis, each case will continue to present unique facts and affect the system of justice in a unique way. *See Furey v. Com'n Judicial Performance*, 743 P.2d 919, 930 (Cal. 1987) (explaining how sanctioning is ultimately more of an art than a science and turns on the facts presented in each case). Nevertheless, where, as here, a judge has participated in a fraudulent conveyance, was less than forthright with the JCC, and impeded the execution of a supreme court order, a severe sanction is required.

In arguing for us to affirm the three-month suspension, Judge Coffey relies upon *Snow's Case*, 140 N.H. at 618. There, a police officer had stopped Judge Snow's brother and issued him a citation for speeding. *Id.* at 620. Upon learning of the citation, Judge Snow, who was acquainted with the police officer, called and left a message at the police department requesting a return call. *Id.* Immediately upon receiving the message, the officer realized that the man he had ticketed was likely to be Judge Snow's brother and spoke to an individual in his department about the procedure for "fixing" a ticket. *Id.* The officer then called Judge Snow and informed

him that he could "take care of" the summons; Judge Snow informed his brother of the same; and the summons was subsequently destroyed. *Id.* Despite Judge Snow's protestations that he had not called the officer with the intent to fix the ticket, *id.* at 624, we held that Judge Snow's act of calling the officer, even if innocently made, was sufficient to create an appearance of impropriety in violation of Canons 1, 2(A) and 2(B) of the Code, *id.* at. 619, 624. As a result, we adopted the six-month suspension recommended by the JCC. *Id.* at 619, 628.

We disagree with Judge Coffey's contention that her conduct merits a less severe sanction than that in *Snow's Case*. In that case, Judge Snow argued that he had innocent motives at the time that he placed the phone call to the police officer. *Id.* at 624-25. Although we rejected the significance of Judge Snow's intent as irrelevant to the issue of whether an "appearance of impropriety" had been created, *id.* at 624, the record did not contain any evidence refuting Judge Snow's alleged innocent motive. If such evidence had been present, we could have found that Judge Snow had obstructed justice, *see* RSA 642:1, I (2007) (making it a misdemeanor to hinder or obstruct a public official from discharging the duties of his or her office), or that he had tampered with a witness, *see* RSA 641:5, I(b) (2007) (making it a class B felony to attempt, believing that an official proceeding or investigation is about to commence, to induce a person to withhold "testimony, information, document or thing"), and would have presumably imposed a more severe sanction. Unlike *Snow's Case*, here, as our analysis indicates, there is considerable evidence of Judge Coffey's intent.

Our only other relevant case presented the unique situation of a part-time judge who had been suspended from the practice of law. *In re Mussman*, 113 N.H. 54 (1973). There, we suspended the judge from sitting on the bench for "so long as he is . . . suspen[ded] from the practice of law" in order to cure the anomalous situation of an "attorney suspended from the practice of law . . . sitting as a justice." *Id.* at 57. Mussman, however, was not indefinitely suspended from judicial office since he, like any suspended or disbarred attorney, *see* SUP. CT. R. 37(14) (setting forth procedure for reinstatement and readmission of a suspended attorney); SUP. CT. R. 37A (noting that a "disbarred attorney may only apply for readmission to the bar of this State upon petition to the court, after having complied with the terms and conditions set forth in the disbarment order"), could petition to end his suspension and be reinstated.

Indeed, we have never decided whether we have the constitutional authority to indefinitely suspend judges from judicial office. However, in *In re Mussman*, 112 N.H. 99, 100 (1972), we discussed the parameters of our authority to sanction a judge. We explained that "the judiciary has no power of impeachment" as that "is exclusively a legislative prerogative."

*Mussman*, 112 N.H. at 100 (citing N.H. CONST. pt. II, arts. 38, 39). We also noted that "[t]he power of the Governor and Council to remove a state officer 'for reasonable cause upon the address of both houses of the legislature' is an executive and legislative proceeding," *id.* (quoting N.H. CONST. pt. II, art. 73); and that "[t]he judiciary has not been granted the removal power *by this method,* either by the constitution or the common law," *id.* (emphasis added; citation omitted). However, based upon our statutory power "to exercise general superintendence of the courts in this State," and our "common-law powers," we concluded that we have the authority "to take disciplinary action short of removal from office." *Id.* at 101 (citations omitted). We explained that "[i]t has never been the tradition of the jurisprudence of this court to refuse to exercise judicial power when there was an established need for it and there was no constitutional barrier to its exercise." *Id.* at 103 (citations omitted).

In contrast to Mussman, who was suspended from sitting as a judge for "so long as he is under suspension from the practice of law," *Mussman*, 113 N.H. at 57, an unconditional indefinite suspension appears to be tantamount to removal, an option that we have never found to be within our authority and is not explicitly granted to us by either the constitution or the common law. *Mussman*, 112 N.H. at 100. It is unclear whether or when the indefinitely suspended judge could have the suspension lifted. Without any conditions for reinstatement, the suspended judge remains unaware of what, if any, further action on her part would justify reinstatement. Because *Mussman* states that the executive and legislative branches have an explicit power to remove and that neither the constitution nor the common law explicitly grants us this power, it is unclear whether we have the authority to effectively remove a judge by unconditionally suspending her for an indefinite period of time.

Moreover, our survey of cases from other jurisdictions indicates that when courts exercise their authority to remove a judge, the judge's misconduct is more than one transgression in an otherwise long, unblemished career. *See* AJS STUDY, *supra* at 7-23 (collecting cases). Instead, courts remove judges for conduct that demonstrates an extreme disregard for the institution of the judiciary, such as where a judge has: (1) committed a crime, *see Matter of Koch*, 890 P.2d 1137, 1137, 1139 (Ariz. 1995) (removing a judge who was convicted of soliciting prostitution); *In re Sherrill*, 403 S.E.2d 255, 256-57 (N.C. 1991) (removing a judge who pled guilty to possession of marijuana, cocaine, and drug paraphernalia); (2) sexually harassed court personnel, *see Matter of McClain*, 662 N.E.2d 935, 937, 944 (Ind. 1996) (removing a judge who sexually harassed a female court employee by making anonymous phone calls and sending "vulgar unsigned letters, one of which was accompanied by a used condom"), *cert.*

*denied*, 519 U.S. 1027 (1996); (3) engaged in a pattern of conduct on the bench that is a gross abuse of the power attendant to the position, *see Matter of Pekarski*, 639 A.2d 759, 761-63 (Pa. 1994) (removing a judge for failing to recuse herself from approximately thirty-three matters involving family friends and, in addition, accepting money from a party); *Matter of McKinney*, 478 S.E.2d 51, 52, 54 (S.C. 1996) (removing a judge for issuing an arrest warrant at the behest of his daughter and dropping the charges only after the defendant had paid his daughter $500); or (4) engaged in a knowing, persistent course of misconduct, *see Fletcher v. Com'n on Jud. Performance*, 968 P.2d 958, 991 (Cal. 1998) (removing a judge from office for, among other things, engaging in conduct prejudicial to the administration of justice on sixteen different occasions); *Inquiry Concerning Johnson*, 692 So. 2d 168, 172-73 (Fla. 1997) (removing a judge who, despite being previously warned about similar conduct, ordered her clerk to back-date over forty cases in order to appear more efficient under judicial performance metrics).

We have not found, and neither party has provided, any case law from other jurisdictions that addresses judicial misconduct similar to that currently before us. Faced with this lack of helpful authority, examination of the attorney misconduct cases can provide some insight. While judicial and attorney misconduct cases are only comparable to a limited extent, *see Thayer*, 145 N.H. at 183, that is not to say that they are completely valueless.

A factually similar case is *In re Goldman*, 795 N.Y.S.2d 209, 210-11 (App. Div. 2005), where an attorney made fraudulent transfers to his wife to avoid a judgment, testified falsely at a deposition, and flouted certain court orders. A disciplinary proceeding resulted in the attorney being suspended from the practice of law for one year. *Goldman*, 795 N.Y.S.2d at 212. If faced with an attorney who engaged in the same conduct as Goldman, we would have imposed a sanction at least as severe as the one imposed in that case. *Compare Bruzga's Case*, 145 N.H. 62, 71-72 (2000) (suspending an attorney for one year for making misrepresentations about his ex-wife in an abuse and neglect petition, submitting said petition in an effort to harass, and "[e]ngag[ing] in semantical gamesmanship" to justify his actions), *with Grew's Case*, 156 N.H. at 370 (holding that a two-year suspension was appropriate, in the face of several mitigating circumstances, for an attorney who was convicted of misdemeanor-level insurance fraud).

In determining the length of suspension required beyond that imposed in *Goldman*, we are guided by the severity of suspensions applied to judges by other courts. As noted in the AJS STUDY, from 1990 to 2001, in cases such as this where "it is decided that censure is too lenient and removal too harsh," AJS STUDY, *supra* at 30, the suspensions imposed nationwide have

ranged from three days, *see In re Jacobi*, 715 N.E.2d 873, 874, 875 (Ind. 1999) (judge entered temporary restraining order without following procedure requiring filing attorney to certify that notice had been given to opposing party); *Matter of Hocking*, 546 N.W.2d 234, 245-46 (Mich. 1996) (judge was intemperate and abusive towards an attorney at trial), to two years, *see Disciplinary Proceedings Against Breitenbach*, 482 N.W.2d 52, 52-53 (Wis. 1992) (judge had, among other things, brought a concealed weapon into court on multiple occasions, left the same in a wastebasket by mistake on more than one occasion and been generally abusive towards parties and court personnel). *See also* AJS STUDY, *supra* at 30 (collecting cases). Suspensions beyond two years are rarely imposed because, at least in part, of the countervailing harm to the administration of justice occasioned by a judge's lengthy absence. *See Inquiry Concerning a Judge*, 462 S.E.2d at 736 n.13.

Two years is also a frequently imposed suspension in recent cases involving attorneys. *See, e.g., Grew's Case*, 156 N.H at 362 (two-year suspension for insurance fraud); *Bosse's Case*, 155 N.H. 128, 129-130 (2007) (two-year suspension for deceitful conduct); *Coddington's Case*, 155 N.H. 66, 71-72 (2007) (two and one-half year suspension for trust account violations). While some cases have involved sanctions of less than two years, *Feld's Case*, 149 N.H. 19, 21, 30 (2002) (one-year suspension for intentionally assisting client to give false answers); *Bruzga's Case*, 145 N.H. at 63, 64-65 (one-year suspension for false statement to a tribunal), other cases have involved disbarment, *see, e.g., Cohen's Case*, 143 N.H. at 171-72 (disbarring attorney for his repeatedly dishonest conduct, including falsely informing client that he had filed bankruptcy petition, forging clients' names to a bankruptcy petition, filing bankruptcy petition after client instructed him not to do so, and falsely answering bar counsel's interrogatory); *Astles' Case*, 134 N.H. at 604-06 (disbarring attorney for repeatedly using dishonest and fraudulent means to obtain commercial financing for his home, continuing his deceit when given several opportunities to acknowledge misconduct, and persisting in his dishonesty when addressing the PCC); but, as discussed above, it is unclear whether we can "disbar" a judge.

However, as noted above, judges hold elevated and highly public positions in society. Because their misconduct is undeniably more harmful to the public's perception of both the legal profession and the judiciary as a whole, judges must maintain standards of personal and professional care beyond that of regular attorneys. *See Snow's Case*, 140 N.H. at 621. In recognition of this heightened standard, we conclude that a suspension longer than two years is necessary in this case.

Finally, it is worth repeating that the purpose of the sanction for judicial misconduct is not to punish the judge, but "to protect the public from further acts of misconduct." *Id.* While Judge Coffey can and should be chastised for her misconduct, our task is not to punish her personally, but to protect the public. Nothing in the record suggests that Judge Coffey's misconduct is likely to be repeated, or that her misconduct has affected either the discharge of her judicial responsibilities, or any parties, lawyers or cases that came before her. Indeed, the record shows a broad spectrum of respect for her as a judge. In light of these mitigating factors, the need to protect the public does not justify an unconditional indefinite suspension.

██ Balancing the serious nature of Judge Coffey's misconduct, which includes participation in a fraudulent conveyance, disregard for an explicit court order, and lack of candor, we hold that the recommended three-month suspension must be increased to three years to reestablish confidence in the judiciary and protect "the public from further acts of misconduct." *Snow's Case*, 140 N.H. at 621.

Accordingly, it is ordered that:

(1) Judge Coffey is publicly censured for her misconduct;

(2) Effective today, Judge Coffey is suspended from sitting as a judge for a period of three years, without pay, and pending further order of this court;

(3) As a condition of her reinstatement, Judge Coffey must successfully complete a comprehensive course in judicial ethics, which must be approved in advance by this court and completed at Judge Coffey's own expense;

(4) As a condition of her reinstatement, Judge Coffey must reimburse the JCC for its costs associated with this matter; and

(5) As a condition for her reinstatement, Judge Coffey must demonstrate that she has engaged in no other conduct that violates the Code.

*So ordered.*

DALIANIS, J., concurred; GALWAY, J., dissented.

GALWAY, J., dissenting. I agree with the majority's conclusion that Judge Coffey engaged in serious misconduct. I also agree with the majority that Judge Coffey was complicit in an intentionally fraudulent transfer because she took valuable property and aided her husband in shielding it from creditors, including the PCC, an arm of this court, and that she ignored and interfered with the commands of a valid supreme court order, thereby

adversely affecting the administration of justice. I further agree with the majority that the purpose of the intentionally fraudulent transfer and disregard of this court's order "stemmed from selfish motives," which allowed use of the shielded monies to make improvements and to build equity in Judge Coffey's private residence. Additionally, I agree with the majority that Judge Coffey's conduct caused the PCC to incur unnecessary costs in recovering its debt and inflicted "actual damage to the integrity and public perception of the judiciary." I also agree with the majority that Judge Coffey did not fully cooperate with the PCC and the JCC. I also agree with the majority that Judge Coffey was less than forthright with and made evasive and misleading statements to the JCC. I disagree, however, with the majority's conclusion that the aforementioned conduct by a sitting judge who served as a member of the JCC for a number of years warrants only a three-year suspension. Simply put, when one whose job it is to enforce the law, instead interferes with and disregards the law to her own benefit, the public rightfully questions whether the judicial system itself is worthy of respect. It is impermissible for a judge's conduct to threaten the credibility of the court. As such, I would indefinitely suspend Judge Coffey from sitting as a judge to protect the public and to maintain the integrity of the judiciary.

A judge has a duty to be honest. *See* SUP. CT. R. 38, Canon 1 commentary (a judiciary with integrity requires honest judges). Implicit in the duty of honesty is a duty to be candid and forthright and to avoid making misrepresentations and statements that are deceptive or evasive. The record, as reflected in the majority opinion, amply supports the majority's conclusion that Judge Coffey's statements to the JCC were evasive, misleading and less than forthright. The JCC also found her cooperation was compromised based, in part, upon her statements.

In our attorney discipline cases we have recognized that not only lying, but also *"attempting to mislead* the [disciplinary] committee in an effort to cover up [misconduct] . . . evidences serious disregard for the institutions the respondent as an attorney has sworn to protect and uphold, and disbarment is the only sanction that will truly protect the public and maintain public confidence in the bar under these circumstances." *Fitzpatrick's Case*, 132 N.H. 211, 217 (1989) (emphasis added); *Budnitz' Case*, 139 N.H. 489, 493 (1995). Thus, we increase the sanction imposed when a respondent is dishonest to the disciplinary committee even if the dishonesty stems from an attempt to mislead rather than from an outright lie. Moreover, even the AJS STUDY, adopted by the majority, factors into the judicial sanction determination whether the judge was candid, less than forthcoming, or gave evasive testimony to the disciplinary committee. AJS STUDY, *supra* at 82.

It is undeniable that Judge Coffey engaged in a continuous course of misconduct over a period of years. *See Bosse's Case,* 155 N.H. 128, 132, 134 (2007) (distinguishing between cases where we disbarred attorneys based upon misconduct "involv[ing] a continuing course of dishonest conduct, including lying to the PCC" from those cases resulting in a lesser sanction that stemmed from "an isolated instance of misconduct"). In addition to her complicity in an intentionally fraudulent transfer in 2003, Judge Coffey disregarded and interfered with the explicit commands of a valid court order over a period of years, from August 2005 through November 2007, and she repeatedly gave deceptive and evasive statements to the JCC or its representatives from January 2007 through December 2007. As the JCC found, Judge Coffey had considerable funds available far in excess of the amount needed to satisfy this court's order and the funds were available on multiple occasions after we issued the order. Therefore, Judge Coffey's conduct was ongoing, and the majority should have increased her sanction accordingly.

"Judges personify the justice system upon which the public relies to resolve all manner of controversy, civil and criminal." *Matter of Mazzei,* 618 N.E.2d 123, 125 (N.Y. 1993). "It is a great public trust. Indeed, judges are the most visible symbol of the rule of law in our society." *Snow's Case,* 140 N.H. 618, 627 (1996). "[D]eception is antithetical to the role of a Judge who is sworn to uphold the law and seek the truth." *Matter of Collazo,* 691 N.E.2d 1021, 1023 (N.Y. 1998) (quotation omitted) (sanction imposed on judge was removal where he gave false statements in judicial discipline proceedings); *see Matter of Mazzei,* 618 N.E.2d at 126 (sanction imposed on judge was removal where judge completed and submitted false credit card application, used the card, and made misrepresentations to investigating bank).

Applying our current jurisprudence, if an attorney engaged in serious misconduct by partaking in an intentionally fraudulent conveyance, ignoring and interfering with the commands of a valid court order, giving evasive and misleading testimony to the disciplinary committee, thereby failing to cooperate fully with that committee, and personally benefiting from such misconduct, that attorney, undoubtedly, would be disbarred. We cannot hold our judges to a lesser standard.

Indefinite suspension is the most severe sanction that this court can impose upon judges—just as disbarment is the most severe sanction that this court can impose upon attorneys. Our constitution allows judges to "hold their offices so long as they behave well." N.H. CONST. pt. I, art. 35. When they do not, we are empowered to implement the constitutional mandate by taking the necessary disciplinary measures short of removal. *In re Mussman,* 112 N.H. 99, 102-03 (1972). Thus, indefinite suspension

falls within the ambit of the exercise of our constitutional authority. It has never been the tradition of the jurisprudence of this court to refuse to exercise judicial power when there was an established need for it and there was no constitutional barrier to its exercise. *Id.* Therefore, this court has previously recognized its authority to indefinitely suspend a judge. *See In re Mussman*, 112 N.H. at 103 (recognizing our authority to order suspension of a judge); *In re Mussman*, 113 N.H. 54, 57 (1973) (ordering judge suspended from sitting on the bench so long as he is suspended from practicing law, which was indefinitely); *cf. Welanko's Case*, 99 N.H. 413, 414 (1955) (ordering indefinite suspension of attorney).

The determination as to whether or not the legislature or the Governor and Council should remove Judge Coffey is an issue that is solely within their province. Our role is solely to issue appropriate discipline. Where, as here, a sitting judge has committed the above-described "serious misconduct," a severe sanction is required. By her actions, she has demonstrated a continuing disregard for the integrity of the judicial system. Moreover, Judge Coffey's "conduct is fundamentally inconsistent with the responsibilities of judicial office." *In re Graziano*, 696 So. 2d 744, 753 (Fla. 1997); *see Fitzpatrick's Case*, 132 N.H. at 217 (attempting to mislead the disciplinary committee evidences a serious disregard for the institutions that the respondent swore to protect and uphold); *In re Renke*, 933 So. 2d 482, 496 (Fla. 2006) (removing judge from office). While I recognize the majority's concerns that a lengthy suspension adversely affects the administration of justice occasioned by a judge's absence, such effect on the judiciary pales in comparison to the alternative of failing to apply the appropriate sanction.

It is the "duty and responsibility of courts to . . . protect the judicial processes from being brought into disrepute and to act vigorously when confronted with acts or conduct which tend to obstruct or interfere with the due and orderly administration of justice." *State v. Moquin*, 105 N.H. 9, 11 (1963).

Without judges who follow the law themselves, the authority of the rule of law is compromised. *Cf. Snow's Case*, 140 N.H. at 627. Accordingly, the sanction imposed must take into account the concerns of future litigants who appear before Judge Coffey and question why they would need to follow the rule of law that she imposes upon them when she herself has not followed the law.

Given the serious nature of the misconduct in this case, and after considering the available authority and applying the relevant factors, I would hold that an indefinite suspension without pay is necessary in order to maintain the integrity of the judiciary, maintain public confidence in the

judiciary, and prevent similar acts of misconduct in the future. *See Petition of Judicial Conduct Comm.*, 151 N.H. 123, 126 (2004); *Petition of Thayer*, 145 N.H. 177, 181 (2000).

I respectfully dissent.